# EXHIBIT 7

## Page 1

```
          UNITED STATES BANKRUPTCY COURT

           NORTHERN DISTRICT OF TEXAS
    _____

    IN RE:

       THINK FINANCE, LLC,        Case No.
    ET AL                         17-33964
                                  (HDH)

                        Volume 3

    _____


         VIDEOTAPED EXAMINATION UNDER OATH OF

               BILLI ANNE RAINING BIRD
    _____


         BE IT REMEMBERED, the Videotaped
    Examination Under Oath of BILLI ANNE RAINING BIRD
    was taken by Mr. Steven Ellis, Attorney at Law,
    for the Debtor, at the Baldwin Court Reporting
    Offices, 306 3rd Avenue, Suite 202, Havre,
    Montana, on Friday, October 5, 2018, beginning at
    the hour of 10:26 AM.  Reported by Stacy M.
    Baldwin, Registered Professional Reporter and
    Notary Public.
```

## Page 2

**APPEARANCES:**

ATTORNEY APPEARING ON BEHALF OF THINK FINANCE:

MR. STEVEN A. ELLIS
Attorney at Law
GOODWIN PROCTER LLP
601 South Figueroa Street
Los Angeles, California 90017
Sellis@goodwinlaw.com
(Appeared via telephone)

ATTORNEY APPEARING ON BEHALF OF THINK FINANCE:

MR. LEO WARD
Attorney at Law
BROWNING, KALECZYC, BERRY & HOVEN, P.C.
201 West Railroad, Suite 300
Missoula, Montana 59802
Leow@bkbh.com
(Appeared via telephone)

ATTORNEY APPEARING ON BEHALF OF VIRGINIA CLAIMANTS:

MR. ANDREW J. GUZZO
Attorney At Law
KELLY & CRANDALL, PLC
500 Ala Moana Blvd., Ste. 400
Honolulu, Hawaii 96813
Aguzzo@kellyandcrandall.com
(Appeared via telephone)

ATTORNEY APPEARING ON BEHALF OF MS. MILLER:

MR. MATTHEW B. BYRNE
Attorney at Law
GRAVEL & SHEA PC
76 St. Paul Street, 7th Floor
P.O. Box 369
Burlington, Vermont 05402-0369
Mbyrne@gravelshea.com
(Appeared via telephone)

The videographer: Jennifer K. Wells

## Page 3

```
                                            PAGE
              I N D E X

VIDEOTAPED EXAMINATION OF BILLI ANNE RAINING BIRD
    BY MR. ELLIS                         6
    BY MR. GUZZO                        63
    BY MR. BYRNE                       141
    BY MR. ELLIS                       162
    BY MR. GUZZO                       168

Certificate Page                        176

                                     MARKED
         E X H I B I T S

Exhibit 4   Email Chain - Bates No.      28
            TF-PA-319516 and Tf-PA-319517

Exhibit 5   Amended and Restated Loan Sale  30
            Agreement - Bates No.
            TF-PA-386399 through and
            including TF-PA-386427

Exhibit 6   Email Chain                  34

Exhibit 7   Email Chain                  37

Exhibit 8   Email Chain                  42

Exhibit 9   Email Chain                  47

Exhibit 10  Audit Report Year Ended      55
            September 30, 2011

Exhibit 11  Email Chain with Attachment - 60
            Bates No. TF-BK-VA_FOO_0027758
            through and including
            TF-BK-VA_FOO_0027921

Exhibit 12  Time Sheet for Think Finance - 68
            Chippewa Cree Transaction

Exhibit 13  Email - Bates No. Haynes0000446  75

Exhibit 14  Email Chain - Bates No. Haynes   81
            0000447 and Haynes 0000478
```

## Page 4

```
Exhibit 15  Servicing Agreement - Bates No.   88
            TF-VA013170 through and
            including TF-VA013184

Exhibit 16  Marketing Agreement - Bates No.   99
            TF-PA-001151 through and
            including TF-PA-001166

Exhibit 17  Participation Agreement - Bates  105
            No. TF-PA-000038 through and
            including TF-PA-000068

Exhibit 18  Consumer Installment Loan        111
            Agreement

Exhibit 19  Email Chain - Bates No.          129
            TF-VA025676 through and
            including TF-VA0256578

Exhibit 20  Loan Underwriting Policy -       133
            Bates No. TF-VA0701951 through
            and including TF-VA0701957

Exhibit 21  Email Chain - Bates No.          136
            TF-VA0701958

Exhibit 22  Email Chain - Bates No.          142
            TF-VA0736214 through and
            including TF-VA0736217

Exhibit 23  Email Chain - Bates No.          146
            TF-VA0733316 and TF-VA0733317

Exhibit 24  Email - Bates No.                153
            TFBK-NC-000162 and
            TFBK-NC-000163

Exhibit 25  Email Chain - Bates No.          155
            TF-VA0734734 through and
            including TF-VA0734737

Exhibit 26  Email Chain - Bates No.          156
            TF-VA0734130 through and
            including TF-VA0734132

Exhibit 27  Letter - Bates No. TF-VA0412413  156
```

**Page 49**

1 approved and we reviewed it and we approved it.
2  Q. And when you say "they," in that answer
3 are you referring to Think Finance or one of its
4 affiliates?
5  A. Yes.
6  Q. And was it general practice -- okay. Let
7 me just take a step back here. Was the general
8 practice that -- let me ask the question
9 differently.
10      What was Plain Green's role in change
11 controls?
12  A. Review and approval, I guess, that's it.
13  Q. I'm sorry, I couldn't get the last couple
14 words of your answer.
15  A. I said review and approval and that was
16 it.
17  Q. And when you were CEO of Plain Green,
18 were you the person in charge of reviewing
19 proposed change controls?
20  A. Yes.
21  Q. And when Mr. Rosette was CEO, was he the
22 one in charge of that?
23  A. Yes.
24  Q. And what would -- when you were CEO of
25 Plain Green, what would you do when you received a

**Page 50**

1 request from Think Finance for a change control?
2  A. Depending on what it was, I may send it
3 to the attorneys, but if it wasn't a major issue,
4 then I would sign it and a send it back.
5  Q. Did you ever ask questions about change
6 controls?
7  A. Nothing specific that I remember.
8  Q. Do you recall whether Mr. Rosette ever
9 asked questions about change control, before he
10 stepped back?
11  A. Apparently, he did, yes.
12     MR. GUZZO: Objection, lack of
13 foundation.
14 BY MR. ELLIS:
15  Q. You said something about your attorneys,
16 what was the role of Plain Green's attorneys with
17 change controls?
18  A. They didn't necessarily have to review
19 all of the change controls. I mean, like I said,
20 depending on what it was related to and how
21 serious, what the impact was, then they had no
22 role.
23  Q. Who made the discussion whether to
24 consult with attorneys regarding a change control?
25  A. Sometimes we did, Neal and I, or else

**Page 51**

1 sometimes the Think Finance -- like I said,
2 depending on what it was, they would send to the
3 attorneys as well.
4  Q. And when you were at Plain Green what was
5 your understanding about whether Think Finance or
6 its affiliates could implement a change control
7 without the approval of Plain Green?
8  A. It wasn't supposed to happen. So, I
9 can't say whether or not it did happen or not.
10  Q. Okay. But the general practice, the way
11 it was supposed to happen, what was?
12  A. To send it to us first.
13  Q. I'm sorry, could you repeat that answer?
14  A. To send it to us first.
15  Q. Right. And then what happened after they
16 sent it to you?
17  A. Review it and approve it.
18  Q. And that was supposed to take place
19 before any change control was implemented; is that
20 correct?
21  A. Yes.
22     MR. ELLIS: Okay. This is probably a
23 good time for a break. We've been going a little
24 more than an hour, and I've sort of reached a good
25 breaking point in my outline. If that's

**Page 52**

1 comfortable with anyone else, I would suggest we
2 take a break now.
3     THE VIDEOGRAPHER: We're going off the
4 record at 11:47 AM.
5     (Recess taken at 11:47 AM.)
6     (Back on the record at 12:13 PM.)
7     THE VIDEOGRAPHER: We are going back on
8 the record at 12:13 PM.
9 BY MR. ELLIS:
10  Q. Thank you. Ms. Raining Bird, can you
11 hear me okay?
12  A. Yes.
13  Q. Okay. Ms. Raining Bird, have you ever
14 heard the phrase rent a tribe?
15  A. Yes.
16  Q. What is your understanding of what that
17 phrase means?
18  A. Basically, I guess, it kind of goes back
19 to when Indian gaming started and certain
20 developers or business owners or whatever, were
21 utilizing the Tribe to bypass state laws, and they
22 would pay the Tribe, you know, a minimum amount of
23 money so that they can do business on the
24 reservation.
25  Q. Have you ever heard the phrase rent a

Page 53

1 tribe used in connection with Plain Green?
2    A.   Yes.
3    Q.   What did you hear in that regard?
4    A.   I guess the percentage that we received
5 being, being so low compared to the amount of
6 money that the business owners or the investors
7 were receiving, you know, it was just -- I guess,
8 with gaming, the business -- or the Tribe should
9 be 51 percent owner, and it should be 51 percent
10 owner and then their 49 percent. So, it's just
11 the percentage, just related to the percentage
12 that we received.
13    Q.   Okay. I'm going to just read a
14 statement, and I would like you tell me whether
15 you agree, disagree, agree in part, disagree in
16 part with the statement I'm going to read. Okay.
17        MR. GUZZO: Objection.
18 BY MR. ELLIS:
19    Q.   When you worked at Plain Green you and
20 other members of the Tribe were mere figure heads,
21 who had no involvement in or control over any
22 aspect of the business of Plain Green, do you
23 agree --
24        MR. GUZZO: Objection.
25

Page 54

1 BY MR. ELLIS:
2    Q.   -- do you agree or disagree in part with
3 that statement?
4    A.   Yeah, I agree.
5    Q.   Is this entirely true?
6    A.   Well, I meant, on the surface, I guess we
7 had some control, but really we didn't.
8    Q.   When you say, you had control but you
9 didn't, what do you mean?
10    A.   Just like I said, we didn't have the
11 ability to negotiate the percentage, because, you
12 know, it was that's what you're going to get, you
13 know, and if we don't accept it, then there's
14 other tribes that would be happy to take it. You
15 know, I meant, things like that.
16        If we didn't approve something then our
17 bosses would be called and, you know, it would
18 just come down on us. If we took our time in
19 getting something signed, or if we didn't get
20 something done within a certain timeframe or
21 whatever timeframe they -- we were given, then our
22 bosses would be called, which was the tribal
23 council or the Board, and then we would have
24 pressure put on us by them.
25        So, we didn't create any of these

Page 55

1 documents, all the documents were created, I
2 guess, there wasn't a whole lot of room to
3 negotiate on a lot of the things, so. . .
4    Q.   Okay.
5        MR. ELLIS: I'd like to ask the court
6 reporter to put the document we talked about on
7 the record. It's the Chippewa Cree Tribe
8 financial and compliance audit report, year end is
9 September 30, 2011. I would like to ask the court
10 reporter to mark that as Exhibit 10.
11        (Off the record discussion.)
12        (Exhibit 10 marked for identification.)
13 BY MR. ELLIS:
14    Q.   Ms. Raining Bird, do you have Exhibit 10
15 in front of you?
16    A.   Yes.
17    Q.   Have you seen Exhibit 10, before?
18    A.   I'm not sure.
19    Q.   All right. Let me just ask you to turn
20 to Page 9 of Exhibit 10. There's page numbers at
21 the very bottom.
22    A.   Actually Page 9 is missing. Yeah, Page 9
23 is missing.
24    Q.   I gave you the wrong date. I'm on Page
25 8.

Page 56

1    A.   Okay.
2    Q.   Page 8, at the top of it states, it just
3 reads Chippewa Cree Tribe statement of activity
4 year end September 30, 2011. Are we looking at
5 the same page, it says 8 at the bottom?
6    A.   Yes.
7        MR. BYRNE: Hey, I got a question, my
8 version of the document there is no Page 9. There
9 is no Page 11.
10        MR. ELLIS: I think there may be a
11 copying problem. I'm only going to ask a question
12 about Page 9 -- Page 8. I keep saying Page 9.
13 Let me just go ahead and ask my question about
14 Page 8, and if there's a problem with the document
15 we can do that later.
16        MR. BYRNE: Yeah, and I don't know if
17 that's true, because you're asking about
18 consolidated -- you're asking about financial
19 statements, and they would need to all be put
20 together, and not having the right pages,
21 particularly for a document that hasn't been
22 produced to us, is particularly problematic,
23 because Page 9, might have all of the important
24 information on it.
25

**85**

BY MR. GUZZO:
Q. Okay.
    MR. ELLIS: Excuse me, could I have the witnesses answer read back. I was objecting and I couldn't hear her answer.
    THE WITNESS: I said no.
BY MR. GUZZO:
Q. Okay. And so during your tenure as the chief operations officer and as the chief executive officer of Plain Green, you don't think Think Finance shared your vision of wanting to take on more responsibility; is that right?
A. No, they did not.
    MR. ELLIS: Objection.
    (Whereupon, the Court Reporter
    interrupted for clarification.)
BY MR. GUZZO:
Q. And, would it be fair to say, that Think Finance actually wanted to keep the Tribe in the dark so you guys could not take the business over yourselves?
A. Yes.
    (Whereupon, the Court Reporter
    interrupted for clarification.)
    MR. ELLIS: Same objection, lack of

**86**

foundation.
BY MR. GUZZO:
Q. Okay. And why do you think that?
A. I meant, my personal opinion was they were going to use the Tribe temporarily to make as much money as they could, and then move onto another tribe, that was my opinion.
Q. And that's based on your experience as the COO and the CEO?
A. Yes.
Q. Okay. And do you know if anyone else at Plain Green shared that feeling?
A. Yes.
Q. Who else shared that feeling?
A. Neal Rosette, Bobbi Favel. I guess internal office staff, but I'm not sure about some of the Board members. I'm sure some of them felt the same way, but I can't say for sure.
Q. Okay. And I want to draw your attention to Paragraph 1, at the top of this document.
A. Yes.
Q. And it states that Haynes investments will deposit 1,000,000 into the bank account that Plain Green has at First Bank of Delaware, do you see that?

**87**

A. Yes.
Q. And so did Plain Green use any of its own money to make the loans?
A. No.
Q. And is that for the entire time that you were working for Plain Green, is that your understanding?
A. Yes.
Q. Okay. And so if a consumer defaulted, let's say on a $1,300 loan, that was made by Plain Green. Plain Green actually didn't lose any money because of that, other than the upside for the loan; is that right?
A. Yes.
Q. So, it would be fair to say, that Plain Green did not have a risk of loss based on people?
A. No.
    MR. ELLIS: Object as to form.
BY MR. GUZZO:
Q. Can you clarify that?
A. No.
Q. No, they did not have a risk of loss, right?
A. No, they did not.
Q. I'm sorry, I think we're kind of saying

**88**

it differently, but we're saying the same thing.
A. No, Plain Green --
Q. Is it fair to say, that Plain Green would have no risk of loss if a consumer defaulted on a loan?
A. No, Plain Green did not have any risk in the loss of the loan.
Q. Okay.
    MR. GUZZO: Stacy, if you could hand her the fourth document I sent to you and we will mark that as Exhibit 14, I think. 15, sorry.
    (Exhibit 15 marked for identification.)
BY MR. GUZZO:
Q. Ms. Raining Bird, do you recognize this document?
A. Yes.
Q. And I want to turn your attention to Page 10 of the document. It's Bates No. 131E0 on the bottom right-hand corner.
A. Okay.
Q. And is that your signature on Page 10 of this agreement?
A. Oh, yes.
Q. Okay. And in your capacity as the chief operations officer, you signed this document on

101

1 you know, when you enter a -- when you do a search
2 where Plain Green would come up at the top or
3 closer to the top. Just any promotion of the
4 product.
5    Q.   And what role did Plain Green have in the
6 marketing of the loans?
7    A.   None.
8    Q.   Okay. So you didn't personally
9 participate in the development of any marketing
10 strategies, did you?
11    A.   No.
12    Q.   Do you understand what the term pro forma
13 means?
14    A.   Yeah.
15    Q.   And what does the word pro forma mean to
16 you?
17    A.   I don't know. I guess I'm not even sure.
18    Q.   All right. I'm going to read the
19 definition of this, and I'm going to ask you to
20 say whether, what you think about this. So pro
21 forma means to be done or produced as a matter of
22 form, according to the dictionary.
23       So, essentially, it means to be done
24 without substance or contribution. And so, would
25 you say that Plain Green's review of any marketing

102

1 materials was pro forma?
2    A.   Yes.
3    Q.   So you would agree that you didn't have
4 any meaningful input on any of the marketing
5 materials; is that right?
6    A.   Yes, I agree with that.
7    Q.   And so when we talked earlier about being
8 fearful that Think Finance would terminate the
9 relationship if you didn't agree with something,
10 you would agree that one of the things would be
11 that that statement would apply to would be
12 marketing, right?
13    A.   Yes.
14    Q.   And so, if you didn't like a direct
15 mailing or a website design, you believe you
16 wouldn't really be able to put meaningful input
17 into that under this agreement; is that right?
18    A.   Yes.
19    Q.   So just a few final questions about this
20 agreement. What is your understanding of what
21 Tailwind Marketing is?
22    A.   It's just another, another branch of
23 Think Finance.
24    Q.   Okay. And in communicating with Think
25 Finance pursuant to marketing, did you ever email

103

1 with any employees of Tailwind?
2    A.   I meant, I've never seen anybody that
3 introduced themselves as working for Tailwind, no.
4    Q.   So all of your marketing communications
5 with Think Finance, were with Think Finance, not
6 Tailwind; is that correct?
7    A.   Yes.
8       MR. ELLIS: Objection to the form.
9 BY MR. GUZZO:
10    Q.   So did that ever concern you?
11    A.   Yeah.
12    Q.   And so, would it be fair to say, that you
13 were concerned that you would be paying a company
14 that you didn't even interact with?
15    A.   No. My concern was that we were paying
16 one company -- we were paying one company six,
17 seven times.
18    Q.   Yeah. So, I guess, it seemed like Think
19 Finance was double dipping, so to speak?
20    A.   It was more than double.
21       MR. ELLIS: Objection.
22       THE WITNESS: Yes, every agreement would
23 be another bit.
24       (Whereupon, the Court Reporter
25       interrupted for clarification.)

104

1       MR. ELLIS: Objection, argumentative.
2 BY MR. GUZZO:
3    Q.   And we earlier talked about how, you
4 know, this was seen has a take-it-or-leave-it deal
5 for the term sheet, do you remember that?
6    A.   Yes.
7    Q.   Would that be the same for the marketing
8 agreement?
9    A.   Yes.
10    Q.   And the same for the servicing agreement,
11 right, that was a take-it-or-leave-it agreement?
12    A.   Yes.
13    Q.   And why did they -- did Plain Green's
14 employees -- or Plain Green's attorneys have input
15 on these agreements, do you recall?
16    A.   I meant, they reviewed them, but they
17 didn't have really any input, like, I don't ever
18 recall them making any modifications or changes to
19 them.
20    Q.   And when you say that you were fearful
21 that, you know, Think Finance would move to
22 another tribe. Do you think that the attorney
23 that Plain Green shared that same sentiment?
24       MR. ELLIS: Objection, lack of
25 foundation.

**Page 137**

1 right?
2     A. Yes.
3     Q. And then, Mr. Rosette asks Mr. Smith how
4 to proceed; is that right?
5     A. Yes.
6     Q. And then, do you see where it says, where
7 Mr. Smith says: When you receive complaints and
8 correspondence like this, will you email them to
9 legal@PlainGreen.com? Do you see that?
10     A. Yes.
11     Q. And then do you see where it says that
12 Mr. Smith then says: That will initiate the
13 process to get you into our system, logged and
14 assigned to the correct person. Do you see that?
15     A. Yes.
16     Q. And so, would it be fair to say, that
17 Think Finance controlled or had access to the
18 legal@plaingreenloans.com email address?
19     A. Yes.
20     Q. And during your time at Plain Green, to
21 the best of your knowledge, Plain Green didn't
22 have access to that account; is that right?
23     A. No.
24     Q. No, they did have access or --
25     A. No.

**Page 138**

1     Q. -- or they did not have access?
2     A. No, we did not have access.
3     Q. Okay. And so, when a consumer emailed
4 that address, it actually went to Think Finance
5 not Plain Green; is that right?
6     A. Yes.
7     Q. And then Think Finance handled those
8 complaints; is that right?
9     A. Yes.
10     Q. And was Plain Green provided with a copy
11 of those complaints?
12     A. Yes.
13     Q. And so, how would Think Finance provide a
14 copy of the complaint to Plain Green?
15     A. Well, through email, through Neal
16 Rosette, Jr., and then they got the FTP site set
17 up to where they could share the information
18 online.
19     Q. But Think Finance was tasked with the
20 responsibility of handling consumer complaints
21 during your tenure at Plain Green, correct?
22     A. Not -- I meant, yes, they drafted the
23 letter regarding the complaint, depending on like
24 the BBB letters, most of those became like a, you
25 know, like a form letter that was sent out to

**Page 139**

1 every consumer that we received a complaint from.
2 But it just depends on where the letter came from.
3 But they drafted the original letters and then we
4 were responsible for, you know, sending out the
5 letter from our office. They would send us, you
6 know, all the letters and all the names of these
7 people who need to receive letters.
8     Q. Okay. And so, this is my final line of
9 questioning. Earlier you were asked about your
10 understanding of the term rent a tribe, do you
11 remember that?
12     A. Yes.
13     Q. And so, it's your position that the
14 relationship between Think Finance and Plain Green
15 was a rent a tribe business model; is that right?
16     A. Yes.
17     MR. ELLIS: Object as to form.
18 BY MR. GUZZO:
19     Q. And I just want to quickly summarize, if
20 we can real quick here. It would be your position
21 that Plain Green had no meaningful input on the
22 underwriting of the loans; is that correct?
23     A. No, we did not.
24     MR. ELLIS: Object as to form.
25

**Page 140**

1 BY MR. GUZZO:
2     Q. No, you did not have any meaningful input
3 regarding underwriting; is that right?
4     A. No, we did not.
5     Q. And would that be the same answer for the
6 origination of the loans?
7     A. Yes, same answer.
8     Q. And would that be the same answer for the
9 servicing of the loans?
10     A. Yes.
11     MR. ELLIS: Object as to form.
12 BY MR. GUZZO:
13     Q. And would that be the same answer as to
14 the marketing of the loans?
15     A. Yes.
16     MR. ELLIS: Same objection.
17 BY MR. GUZZO:
18     Q. And would that be the same answer for the
19 collection of the loans?
20     A. Yes.
21     Q. And so, because Plain Green had no role
22 in the underwriting, origination, servicing or
23 marketing, or collection of the loans, that is why
24 you would characterize it has as a rent a tribe
25 scheme?

**141**

1  A.  Yes.
2      MR. ELLIS:  I object to the form.  I
3  think it's inconsistent with the witness's prior
4  testimony about what rent a tribe means to her,
5  and I object to that question mischaracterization.
6  BY MR. GUZZO:
7  Q.  You can answer.
8  A.  Yes.
9  Q.  Okay.  And just so the record is clear
10 without the object, because Plain Green has no
11 role in the underwriting, origination, servicing,
12 marketing, or collection, that is the basis upon
13 which you would say it was a rent a tribe?
14     MR. ELLIS:  Same objection.
15     THE WITNESS:  Yes.
16     MR. GUZZO:  Okay.  I have no further
17 questions for you, Ms. Raining Bird.  Thank you so
18 much for your time.  I hope you got the job you
19 interviewed for, and I'm glad to see you're
20 feeling better.  I think Mr. Byrne may have a few
21 questions for you, but that's all I have.
22                EXAMINATION
23 BY MR. BYRNE:
24 Q.  Hi, this is Matt Byrne.  I'm sorry that
25 you've been put in this position in this

**142**

1  deposition.  I want to start with a document that
2  I sent that was Exhibit 31.  It has the sticker
3  31.  I mean, you can put whatever sticker you want
4  on it, but I just though I would put a number on
5  it so we know what we're talking about.
6      (Exhibit 22 marked for identification.)
7  BY MR. BYRNE:
8  Q.  Can you take a look at the document, but
9  I want to ask you about the email that you sent on
10 March 15, 2013, but feel free to look at the
11 entire document.
12 A.  (The Witness complied.)
13 Q.  Let me know when you're ready?
14 A.  Okay.
15 Q.  Okay.  There was actually two emails on
16 March 15th, but the one I'm interested in was the
17 one at 12:18 AM.  Can you confirm that is an email
18 from you to Sarah Cutrona, Jason Harvison, Ken
19 Rees, and Michelle Nguyen and Dan Belcourt?
20 A.  Yes.
21 Q.  And did you write this email at or near
22 the time of the events described in it?
23 A.  Yes, I did.
24 Q.  And was writing the email something that
25 you did in the regularly conducted activity in the

**143**

1  business of Plain Green?
2  A.  Yes.
3  Q.  And was this writing, this particular
4  email part of that regular practice?
5  A.  Yes.
6  Q.  You say in the first couple of sentences,
7  you say:  As you know, the tribal council, aside
8  from the chairman, are very committed to ensuring
9  with you our best to support the business, and to
10 guarantee we protect our relationship for the
11 integrity of the Tribe.
12     Please, be advised that Chairman Ken
13 Blatt St. Marks has been served a notice of
14 removal and suspension from his duties as tribal
15 chairman by eight other members of the tribal
16 council.
17 Q.  First off, who is Ken Blatt St. Marks?
18 A.  He was a -- he's a member of the Tribe
19 who was elected in to serve as the tribal
20 chairman.  I guess, he replaced the former
21 chairman, I can't remember, I think it was Chance
22 Houle.  But anyway, he was just -- he was kind of,
23 somebody that just was not in favor of some of the
24 agreements and contracts we had in place.
25 Q.  Did Mr. St. Marks want to get more

**144**

1  revenue from the Think Finance deal?
2  A.  Yes.
3  Q.  And were there other people on the tribal
4  council that opposed Mr. St. Marks efforts?
5  A.  Well, I don't necessarily think they
6  opposed his efforts.  They opposed the way that he
7  went about handling the issues.
8  Q.  And were they concerned that Mr. St.
9  Marks methods were going to lose business with
10 Think Finance?
11 A.  Yes.
12     MR. ELLIS:  Object, lack of foundation.
13 BY MR. BYRNE:
14 Q.  You can answer.
15 A.  Yes.
16 Q.  And what was their concern based on?
17     MR. ELLIS:  Object, lack of foundation.
18     THE WITNESS:  Their concern was based on
19 his erratic behavior, and I guess his -- he made a
20 lot of threats, as far as during his -- the time
21 that he was -- before he is elected, you know,
22 when he was running for the position.  There were
23 threats made and things like that.  So it was just
24 based on some of the things that he said.
25