1
2
3
4
5
6

Anna C. Haac (pro hac vice)
**TYCKO & ZAVAREEI LLP**
1828 L Street, N.W., Suite 1000
Washington, DC 20036
Phone: 202-973-0900
Fax: 202-973-0950
Email: ahaac@tzlegal.com

*Attorneys for Plaintiffs and the Class*
*Additional Counsel on Signature Page*

7
8

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| KIMETRA BRICE, EARL BROWNE, and JILL NOVOROT,<br><br>        Plaintiffs,<br><br>v.<br><br>MIKE STINSON; LINDA STINSON; 7HBF NO. 2, LTD.; STARTUP CAPITAL VENTURES, L.P.; STEPHEN J. SHAPER,<br><br>        Defendants. | Case No.: 3:19-cv-01481-WHO |
| KIMETRA BRICE, EARL BROWNE, and JILL NOVOROT,<br><br>        Plaintiffs,<br><br>v.<br><br>HAYNES INVESTMENTS, LLC, and L. STEPHEN HAYNES,<br><br>        Defendants | Case No.: 3:18-cv-01200-WHO<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date: June 23, 2021<br>Time: 2:00 p.m.<br>Judge: Hon. William H. Orrick |

**PLEASE TAKE NOTICE** that on June 23, 2021, at 2:00 p.m., Plaintiffs Kimetra Brice, Earl Browne, and Jill Novorot, individually and on behalf of all others similarly situated, will and hereby do move before the Honorable William H. Orrick for partial summary judgment that: (1) the choice-of-law clauses are unenforceable; (2) California law applies to the loan contracts; (3) that tribal immunity does not bar a cause of action against Defendants; (4) Defendants knew about and furthered the conspiracy in violation of 18 U.S.C. § 1692(d); and (5) members of the enterprise committed collection of unlawful debt in violation of 18 U.S.C. § 1692(c).

Dated: May 19, 2021                    Respectfully submitted,

By: /s/ Anna C. Haac
Anna C. Haac (pro hac vice)
Mark A. Clifford (pro hac vice)
**TYCKO & ZAVAREEI LLP**
1828 L Street, N.W., Suite 1000
Washington, DC 20036
Phone: 202-973-0900
Fax: 202-973-0950
Email: ahaac@tzlegal.com
Email: mclifford@tzlegal.com

Kristi C. Kelly, Esq. (pro hac vice)
Andrew Guzzo, Esq. (pro hac vice)
**KELLY GUZZO, PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com

Sabita Soneji (SBN 224262)
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, CA 94612
Telephone (510) 254-6808
Facsimile (510) 210-0571
Email: ssoneji@tzlegal.com

Craig C. Marchiando, Esq., (SBN 283829)
Leonard A. Bennett, Esq., (pro hac vice)
Amy Leigh Austin (pro hac vice)

**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
Email: craig@clalegal.com
Email: amyaustin@clalegal.com

*Attorneys for Plaintiffs and Class*

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF MATERIAL UNDISPUTED FACTS........................................................ 3

      I.      Think Finance's relationship with First Bank of Delaware. .................................... 3

      II.     Think Finance shifts its business model to tribal lending........................................ 4

      III.    Think Finance and the Otoe-Missouria Tribe enter into a conspiracy to make and
             collect unlawful debt. ............................................................................................ 6

      IV.    Think Finance and the Chippewa Cree Tribe form a similar enterprise and enter
             into a conspiracy to make usurious loans............................................................... 7

      V.     The key contracts establishing the lending enterprises and conspiracy to make
             unlawful debts to consumers. ................................................................................. 9

           A.     Through "Participation Agreements," the tribal entities relinquished 99%
                    of the interest in each of the loans. ........................................................... 9

           B.     Through an Administrative Agency Agreement with GPLS, Think Finance
                    receives the vast majority of the net income from the scheme. ............................... 9

           C.     Other contracts provided Think Finance with authority to handle customer
                    support, collections, and marketing of the loans in exchange for additional
                    revenues. .................................................................................................. 10

      VI.    Defendants Mike and Linda Stinson's knowledge and furtherance of the
             conspiracy to collect usurious loans....................................................................... 11

           A.     The Stinson's ownership interest in Think Finance, as well as power to
                    appoint  and remove a member of the Board of Directors. ................................... 11

           B.     Mike Stinson has judicially admitted to being a trusted individual who needed
                    to know Think Finance's privileged information in order to ensure the
                    proper functioning of the company. ......................................................... 12

           C.     The Stinson's knowledge of the regulatory actions against Think Finance and
                    participation in the spinoff of the company.............................................. 14

           D.     Other evidence of the Stinson's knowledge and facilitation of the scheme......... 18

      VII.   Defendant 7HBF's knowledge and furtherance of the conspiracy to collect usurious
             loans. .................................................................................................................... 19

           A.     7HBF's ownership interest in Think Finance. ........................................... 19

           B.     7HBF has judicially admitted to being an insider who needed to Think
                    Finance's privileged information in order to ensure the proper functioning
                    of the company............................................................................................. 21

           C.     Other evidence regarding 7HBF's knowledge and furtherance of the
                    scheme. ..................................................................................................... 21

VIII.   Defendant Shaper's knowledge and furtherance of the conspiracy. ................................... 23

    A.   Shaper's Role as an Investor, Consultant, and Employee of Think Finance ....... 23

    B.   Shaper reinvested in the Tribal Lending Enterprise notwithstanding his awareness of regulatory scrutiny. ................................................................. 25

IX.   The Haynes' Defendants knowledge and furtherance of the conspiracy. .......................... 26

IX.   Defendant SCV's knowledge and furtherance of the conspiracy to collect usurious loans. ............................................................................................... 27

    A.   SCV's ownership interest in Think Finance and participation in key decisions. . 27

    B.   SCV's awareness of regulatory actions targeting Think Finance, and its approval of the Elevate spin-off. ................................................................. 29

ARGUMENT ................................................................................................................... 30

I.   Summary judgment should be granted that the choice-of-law clauses are unenforceable. ........................................................................................... 30

II.   Summary judgment should be granted with respect to Plaintiffs' claim that California law applies to the loans. .......................................................... 32

III.   Summary judgment should be granted to Plaintiffs and the Class Members as to the Defendants' affirmative defense that tribal immunity applies to the loans. ...................... 34

IV.   Summary judgment should be granted as to each element of the RICO conspiracy claim. ....................................................................................... 35

    A.   The evidence shows that Defendants knew about the scheme. ........................... 36

    B.   The evidence shows that Defendants furthered the scheme and knowingly accepted millions of dollars in benefits from it. ...................................... 38

V.   Summary judgment should be awarded that a violation of § 1962(c) occurred, which was the object of Defendants' RICO conspiracy. ....................................... 41

    A.   Summary judgment should be awarded that an enterprise existed. ...................... 41

    B.   Summary judgment should be awarded that the loans constituted unlawful debt as defined by RICO. .......................................................... 43

    C.   Summary judgment should be awarded that persons associated with the enterprise engaged in the unlawful collection of debt. ............................... 44

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Allstate Ins. Co. v. Benhamou,*
190 F. Supp. 3d 631 (S.D. Tex. 2016)...............................................................41, 42

4

*Am. Exp. Co. v. Italian Colors Rest.,*
133 S. Ct. 2304 (2013) ....................................................................................... 30

5

6

*Boyle v. United States,*
556 U.S. 938 (2009) ........................................................................36, 41, 42, 43

7

*Brice v. Plain Green, LLC,*
372 F. Supp. 3d 955 (N.D. Cal. 2019) ........................................................ passim

8

*Burger King Corp. v. Rudzewicz,*
471 U.S. 462 (1985) ........................................................................................... 33

9

10

*CFPB v. CashCall, Inc.,*
No. 1:13-cv-13167 (Mass) ................................................................................. 16

11

*Consumer Fin. Prot. Bureau v. CashCall, Inc.,*
2016 WL 4820635 (C.D. Cal. Aug. 31, 2016) ...........................................32, 33

12

13

*Fla. Paraplegic Ass'n, Inc. v. Miccosukee Tribe of Indians,*
166 F.3d 1126 (11th Cir. 1999) ......................................................................... 35

14

*Flintkote Co. v. Aviva PLC,*
177 F.Supp.3d 1165  (N.D. Cal. 2016) .............................................................. 32

15

*Gibbs v. Haynes Invs., LLC,*
368 F. Supp. 3d 901 (E.D. Va. 2019) ................................................................ 31

16

17

*Gibbs v. Haynes Investments LLC,*
967 F.3d 332 (4th Cir. 2020) ..............................................................31, 32, 34

18

*Gibbs v. Sequoia Cap. Operations, LLC,*
966 F.3d 286 (4th Cir. 2020) ............................................................................. 31

19

20

*Gibbs v. Stinson,*
421 F. Supp. 3d 267 (E.D. Va. 2019),................................................................. 31

21

*Gingras v. Rosette,*
2016 WL 2932163 (D. Vt. May 18, 2016) ........................................................ 34

22

*Gingras v. Think Fin., Inc.,*
922 F.3d 112 (2d Cir. 2019) .........................................................................31, 35

23

*Goldenstein v. Repossessors Inc.,* 815 F.3d 142, 148 (3d Cir. 2016) .................1, 44

24

*H.J. Inc. v. Nw. Bell Tel. Co.,*
492 U.S. 229 (1989) ........................................................................................... 45

25

*Hengle v. Asner,*
433 F. Supp. 3d 825 (E.D. Va. 2020) ................................................................ 45

26

27

28

*Huynh v. Chase Manhattan Bank,*
  465 F.3d 992 (9th Cir. 2006) ................................................................ 32

*Lewis v. Clarke,*
  137 S. Ct. 1285 (2017) ........................................................................ 35

*MacDonald v. CashCall, Inc,*
  2017 WL 1536427 (D.N.J. Apr. 28, 2017) ........................................ 33

*Mescalero Apache Tribe v. Jones,*
  411 U.S. 145 (1973) ............................................................................ 34

*Michigan v. Bay Mills Indian Cmty.,*
  572 U.S. 782 (2014) ............................................................................ 35

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
  473 U.S. 614 (1985) ............................................................................ 30

*Oklahoma Tax Comm'n v. Chickasaw Nation,*
  515 U.S. 450 (1995) ............................................................................ 34

*Otoe-Missouria Tribe of Indians v. NY State Dept. of Fin. Services,*
  974 F. Supp. 2d 353 (S.D.N.Y. 2013) ................................................ 16

*Otoe-Missouria Tribe of Indians v. NY State Dept. of Fin. Services,*
  769 F.3d 105 (2d Cir. 2014) .............................................................. 33

*Proctor v. Metro. Money Store Corp.,*
  645 F. Supp. 2d 464 (2009) .............................................................. 45

*Puyallup Tribe v. Department of Game,*
  391 U.S. 392 (1968) ............................................................................ 34

*Quik Payday, Inc. v. Stork,*
  549 F.3d 1302 (10th Cir. 2008) ........................................................ 33

*Salinas v. United States,*
  522 U.S. 52 (1997) ........................................................ 1, 2, 36, 38

*Sedima, S.P.R.L. v. Imrex Co.,*
  473 U.S. 479 (1985) .............................................................................. 1

*Sequoia Cap. Operations, LLC v. Gingras,*
  140 S. Ct. 856 (2020) ........................................................................ 31

*Shannon–Vail Five Inc. v. Bunch,*
  270 F.3d 1207 (9th Cir. 2001) .......................................................... 32

*State ex rel. Swanson v. Integrity Advance, LLC,*
  846 N.W.2d 435 (Minn. Ct. App. 2014) .......................................... 33

*United States v. Brandao,*
  539 F.3d 44 (1st Cir. 2008) .............................................................. 36

*United States v. Christensen,*
  828 F.3d 763 (9th Cir. 2015) ........................................................ 1, 36

*United States v. Eufrasio,*
   935 F.2d 553 (3d Cir. 1991) ............................................................................. 45

*United States v. Fernandez,*
   388 F.3d 1199 (9th Cir. 2004) ......................................................................... 36

*United States v. Giovanelli,*
   945 F.2d 479 (2d Cir. 1991) ........................................................................... 45

*United States v. Hallinan,*
   No. 16-130, 2016 WL 7477767 (E.D. Pa. Dec. 29, 2016) .............................. 33

*United States v. Moseley,*
   980 F.3d 9, 18 (2d Cir. 2020) ..................................................................... 33, 44

*United States v. Neff,*
   787 F. App'x 81 (3d Cir. 2019) ................................................................... 2, 34

*United States v. Turkette,*
   452 U.S. 576 (1981) ........................................................................................ 41

*United States v. Williams,*
   974 F.3d 320 (3d Cir. 2020) ........................................................................... 36

*United States v. Zemlyansky,*
   908 F.3d 1 (2d Cir. 2018) ................................................................................ 38

*Williams v. Big Picture Loans, LLC,*
   2020 WL 6784352 (E.D. Va. Nov. 18, 2020) .................................................. 3

**Statutes**

18 U.S.C. § 1691(4) ............................................................................................. 41

18 U.S.C. § 1961(6) ............................................................................. 1, 35, 43, 44

18 U.S.C. § 1962(a)-(d) ...................................................................................... 35

Cal. Civ. Code § 1916-2 (West) .......................................................................... 44

**Other Authorities**

Chippewa Cree Regulatory Code § 10-6-201 (2017) ........................................... 32

*In the Matter of First National Bank,*
   Case No. FDIC-07-256b, Order to Cease and Desist, Order for Restitution,
   and Order to Pay (Oct. 9, 2008) ........................................................................ 4

KNOWLEDGE,
   Black's Law Dictionary (11th ed. 2019) ......................................................... 36

*Otoe-Missouria Tribal Consumer Fin. Servs. Ord.* §§ 5.2(a) (2018) .................. 31

Pub. L. 91–452, § 1. .............................................................................................. 1

Pub.L. 91–452, § 904(a), 84 Stat. 947 ............................................................... 41

Restatement of Conflicts § 188(1) ............................................................................................ 32

Restatement of Conflicts§ 188(2) ............................................................................................ 33

## **INTRODUCTION**

Congress enacted the Racketeer Influenced and Corrupt Organizations Act "to seek eradication of organized crime in the United States," and specifically sought to eliminate "loan sharking" as one of the statute's primary objectives. *See* Pub. L. 91–452, § 1. To accomplish its goal, RICO prohibits "'any person'—not just mobsters—" from conspiring with other members of an enterprise to collect unlawful debts. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495 (1985). "Unlawful debts" under RICO, are debts that are "unenforceable" under state law "in whole or in part as to principal or interest because of the laws related to usury." 15 U.S.C. § 1961(6).

RICO's conspiracy prohibition is both "simple in formulation" and "broad[]" in coverage. *Salinas v. United States*, 522 U.S. 52, 63 (1997). "[U]nlike the general conspiracy provision applicable to federal crimes," RICO "broadened conspiracy coverage by omitting the requirement of an overt act" by each conspirator. *Id.* at 63-64. If one person commits a substantive violation of RICO—such as the collection of unlawful debt—another person may be held liable if he "knew about and agreed to facilitate the scheme." *Id.* at 66. In recognition of this broad coverage, the Ninth Circuit has characterized the "RICO net" as "woven tightly to trap even the smallest fish," including "those peripherally involved with the enterprise." *United States v. Christensen,* 828 F.3d 763, 781 (9th Cir. 2015) (citation and quotation omitted).

This case involves a contemporary loan sharking enterprise revolving around a company known as Think Finance. Founded by Defendants Mike and Linda Stinson, Think Finance was an online lending company that offered loans at triple-digit interest rates—exponentially higher than the interest rate caps of 48 states, including the 10% cap established by California law. Rather than complying with these important laws designed to protect vulnerable borrowers, Think Finance used two entities formed by Native American tribes as the conduit for its illegal loans. Think Finance used the tribal entities to originate its loans pursuant to a dubious and erroneous theory that tribal sovereign immunity would not subject the loans to state laws. Even though regulatory enforcement efforts uncovered their scheme in August 2013, Think Finance continued to engage in these illegal lending activities for six more years until it entered into the nationwide class settlement involving Plaintiffs.

The remaining Defendants are not small fish or peripherally involved with the enterprise. Rather,

Defendants are the founders, funders, and *closely held owners* of Think Finance—a company whose *sole purpose* was the making and collection of usurious loans. In this capacity, Defendants knowingly aided, abetted, and facilitated this brazen and far-reaching conspiracy to collect unlawful debts, receiving tens of millions of dollars along the way. Because no one can genuinely dispute that Think Finance was engaged in the collection of unlawful debt and that Defendants knew about and furthered the scheme, partial summary judgment should be awarded to Plaintiffs as to each of the liability elements of their § 1962(d) conspiracy claim.[1] Resolving this core liability issue now—based on indisputable facts uncovered through four years of litigation—will streamline the remaining issues for trial.

In addition, Plaintiffs seek summary judgment on Defendants' primary defense in this case: the enforcement of the tribal choice-of-law provision, as well as Defendants' interrelated affirmative defense that "Plaintiffs' cause of action based on lending by Native American tribal entities are barred by the operation of tribal immunity." *See, e.g.*, Dkt. 87 at pg. 38. According to Defendants, the choice-of-law provisions in this case require application of the substantive laws of the Otoe-Missouria and Chippewa Cree tribes, thereby requiring dismissal of Plaintiffs' state usury claims. Over the past several years, close to a dozen courts have rejected this precise argument, including an earlier decision from this Court. *Brice v. Plain Green, LLC*, 372 F. Supp. 3d 955, 982 (N.D. Cal. 2019). As the Court previously held: "The choice-of-law provisions in the agreements at issue are unenforceable prospective waivers." *Id.* Since the language of the contracts has not changed since this prior ruling, neither should this Court's earlier ruling. Similarly, tribal immunity "limits how states can enforce their laws against tribes or arms of the tribes, but… it does not transfigure debts that are otherwise unlawful under RICO into lawful ones." *United States v. Neff*, 787 F. App'x 81, 92 (3d Cir. 2019) (emphasis added), *cert. denied*, 2020 WL 1906598 (U.S. Apr. 20, 2020). Tribal immunity also has no application where, as here, the defendants are non-tribal individuals.

Litigation revolving around Think Finance has been ongoing since December 2014—in multiple jurisdictions throughout the country. As a result of this litigation, millions of documents have been produced demonstrating exactly who, what, where, why, and how this tribal lending scheme occurred.

---

[1] Plaintiffs believe that the evidence further establishes that Defendants each participated in the affairs of an enterprise engaged in the collection of unlawful debt. Because this is a slightly higher standard, Plaintiffs move only as to the conspiracy claim because parties who "agree to pursue" the same "objective" may "divide up the work, yet each is responsible for the acts of each other." *Salinas*, 522 U.S. at 63-64.

These documents—uncovered from all of the key participants—demonstrate that Think Finance, Great Plains, Plain Green, Victory Park, and others participated in an enterprise engaged in the collection of unlawful debt. The evidence further proves that Defendants knew about and adopted the goal of furthering the endeavor. Because no reasonable jury could conclude otherwise, partial summary judgment should be entered that Defendants violated § 1962(d) of RICO.

**STATEMENT OF MATERIAL UNDISPUTED FACTS**

**I.    Think Finance's relationship with First Bank of Delaware.**

1.    ▮▮▮▮▮▮ Think Finance was "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Declaration of Anna C. Haac ("Haac Decl.") at Ex. 1 at GPLP00448752.[2]

2.    Since its ▮▮▮▮▮▮▮▮▮▮▮ Think Finance had "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" *Id.*

3.    Prior to adopting the tribal lending business model, Think Finance's loans were "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" *Id.*; *see also* Ex. 2, May 1, 2009 Powerpoint Presentation (providing an overview of the relationship between Think Cash and First Bank of Delaware ("FBD")).[3]

4.    Under this arrangement, loans were originated in the name of FBD, but it served as nothing more than a nominal lender on behalf of Think Cash, Inc., Think Finance's predecessor. *Id.* at TF-PA-504641 (explaining that "First Bank of Delaware Originates the Loans and ThinkCash Acts as Marketer and Administrative Agent.")).

5.    The loans offered through this venture were "short-term (4-24 months), high interest installment loans (87-334% APR)." *Id.* at TF-PA-504638; *see also* Ex. 1 at GPLP00448752 (explaining that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[2] All exhibits referenced herein as numbered exhibits are exhibits to the Declaration of Anna C. Haac.

[3] Payday lenders used national banks as "loan conduits" because the National Bank Act provided banks with an exemption "from the interest rate caps set by state laws." *Williams v. Big Picture Loans, LLC*, 2020 WL 6784352, at *2 (E.D. Va. 2020) (providing background on the genesis of tribal lending).

1   ██████████████████████████████████████████████).

2        6.      Pursuant to this arrangement, FBD received 10% of the revenue from the loans. Ex. 2 at

3   TF-PA-504640.

4        7.      TC Administrative, LLC, a wholly owned subsidiary of Think Cash, received the "excess"

5   of the cash flow after accounting for losses and fixed rate interest payments to investors. *Id.*

6        8.      Beginning in 2008, the Federal Deposit Insurance Corporation took steps to shut down

7   FBD's rent-a-bank arrangements, ordering it to terminate its relationship with "all third-party lending

8   programs," such as Think Cash. *See, e.g., In the Matter of First National Bank*, Case No. FDIC-07-256b, Order

9   to Cease and Desist, Order for Restitution, and Order to Pay (Oct. 9, 2008) (requiring FBD to terminate

10  "all relationships with third-party providers and the termination of all third-party lending programs… or

11  arrangements with third-party providers that exhibit the characteristics of a 'Rent-a-BIN'").

12       9.      Two years later, Think Finance was notified by First Bank of Delaware "that they were

13  going to be terminating the program." Ex. 3, K. Rees Dep. at 157:2-3 (May 8, 2018) (excerpt for deposition

14  of Kenneth Rees explaining FBD's termination of the program); *see also* Ex. 4 at SEQ-CA0002122

15  (October 2010 email from Ken Rees to key participants, including Stinson and Shaper, detailing that he

16  spoke with "the president of the bank" and "*it seems like the regulators have decided to shut down*

17  *any programs like ours*") (emphasis added); Ex. 5 at TF-VA0230475, Nov. 2012 Email from Kenneth

18  Rees ("*Our product*, ThinkCash, provided more than 100% of the income of the bank. *The FDIC*

19  *forced them to terminate it* and the eventual implications were obvious.") (emphasis added).

20       10.     At the time of the termination, the arrangement with FBD represented "a very significant

21  part of the revenue and net income" of Think Cash according to Kenneth Rees, Think Finance's chief

22  executive officer and chairman of its board. Ex. 3, K. Rees Dep. at 157:3-5.

23  **II.     Think Finance shifts its business model to tribal lending.**

24       11.     After receiving notice from FBD of its intent to terminate its relationship with Think

25  Finance in late 2010, Think Finance "assembled the executive team together that weekend to look at a

26  wide variety of things to do." *Id.* at 157:6-8.

27       12.     Among other things, Think Finance evaluated "opportunities in the UK," as well as "tribal

28

1  [lending]," which was "something [Think Finance] hadn't really evaluated in the past." *Id.* at 157:10-14.

2  According to Rees, Think Finance "had a business model" that "worked well" with FBD, and it wanted

3  its next arrangement "to replicate that as much as possible." *Id.* at 183:17-22.

4      13.   As summarized in an ████████████████████████ created by █████████

5  ███████████████████████████████████████████████████████████████

6  ███████████████████████████████████████████████████████████

7  ███████████████████████████████████████████████████████████

8  ████████████████████████

9  ███████████████████████████████████████████████████████████

10 ████████████████████████████████████

11 Ex. 6 at GPLP00448768 (emphasis added).

12      14.   The theory of this "new structure to avoid banking regulatory issues," *id.*, was loans

13 originated by a "tribal lending entity" would have "sovereign immunity" and would not be "subject to

14 state law." Ex. 3, K. Rees Dep. at 158:2-10.

15      15.   In early 2011, Think Finance began seeking potential tribes to participate in the lending

16 venture. *See, e.g.*, Ex. 7, Feb. 2011 PowerPoint Presentation.

17      16.   As part of this process, Think Finance created a PowerPoint entitled "Emergency Cash

18 Lending—A New Source of Tribal Revenue." *Id.* at TF-VA0290544. The PowerPoint claimed that

19 "[o]nline emergency cash lending" represented "a significant opportunity for increased tribal revenue"

20 and that Think Finance had "a unique turnkey solution for helping tribes enter this lucrative market." *Id.*

21 at TF-VA0290545.

22      17.   The "[t]urn-key solution include[d] technology, marketing, risk management, compliance

23 support, and access to capital funding," and the presentation boasted that "[t]ribal entities that partner

24 with Think Finance can quickly generate millions of dollars in profit." *Id.* at TF-VA0290546.

25      18.   The PowerPoint included the following flow chart to help summarize the structure:

26

27

28

1
2
3
4
5
6
7
8
9
10



11  *Id.* at TF-VA0290561.

12
13  ### III.  Think Finance and the Otoe-Missouria Tribe enter into a conspiracy to make and collect unlawful debt.

14  19.     On or around January 12, 2011, representatives of Think Finance met with members of
15  the Otoe-Missouria Tribe. Ex. 8 at TF-VA000916.

16  20.     Prior to this meeting, employees of Think Finance created a PowerPoint presentation
17  entitled "Great Plains Lending Meeting," which contained an agenda of key points to present to the Tribe.
18  *Id.*

19  21.     The agenda of key points included a company overview of Think Finance, an overview of
20  the loan program, the structure of the arrangement, contractual arrangements, operational responsibilities,
21  and next steps. Ex. 8 at TF-VA000917.

22  22.     Great Plains had not been formed as of the date of this meeting, and the presentation
23  identified one of the "next steps" as "[c]reate tribal entity—Great Plains Lending, LLC." *Id.* at TF-
24  VA000927. The other steps included setting up a "tribal bank account at FBD," "[r]eview/approve
25  consumer legal documents," and "[r]eview/sign contractual agreements." *Id.*

26  23.     By February 24, 2011, the Otoe-Missouria Tribe had agreed to enter into the venture with
27  Think Finance as reflected by the "Trademark and URL Assignment Agreement," which transferred the

28

trademark and web address (www.greatplainslending.com) to the tribal entity for $100.00. Ex. 10 at TF-VA000617. That same day, Rees sent an e-mail attaching the URL Agreement to Think Finance's key executives and instructing them to "start your engines!!" Ex. 11 at TF-VA001630.

24.     Consistent with the primary purpose of the venture, all loans originated in the name of Great Plains "had an annual percentage interest rate greater than 50%" as confirmed by Think Finance's Response to Requests for Admission in the bankruptcy matter. Ex. 9 at RFA No. 16.

25.     In addition, as part of the prior nationwide class settlement involving Think Finance, it agreed to "provide the proposed Class Administrator global historical loan level data" for the loans "sufficient to enable an analysis of state-by-state distribution percentages and for use in all other distribution calculations contemplated" by the settlement. Ex 12 at ThinkOwnerLit000443.

26.     Think Finance produced this "consumer-level account data" to RSM, LLP, Ex. 13 at ¶ 3, who reproduced the data in response to subpoena in this case. *Id.* at ¶ 4.

27.     This data shows that ███ loans were made in the name of Great Plains to California consumers during the relevant Class period. Haac Decl. at ¶ 5; Excel Exhibit 1.

28.     For "[e]ach loan account" provided by Think Finance, it included certain "data fields," including the interest rates charged on the loans. Ex. 13 at ¶ 5; Excel Exhibit 1.

29.     This data reveals that all consumers, but ███, were charged interest rates far in excess of 20%. Haac Decl. at ¶ 5; Excel Exhibit 1.

30.     More specifically, Think Finance's data shows that: (i) ███ loans had interest rates than ranged between ██████; (ii) ███ loans had interest rates than ranged between ██████; (iii) ███ loans had interest rates than ranged between ██████; (iv) ███ loans had interest rates than ranged between ██████ and (v) ███ loans had interest rates greater than ███. *Id.*

## IV.     Think Finance and the Chippewa Cree Tribe form a similar enterprise and enter into a conspiracy to make usurious loans.

31.     On March 11, 2011, Think Finance, the Chippewa Cree Tribe, Defendant Haynes Investment, and GPL Servicing Ltd. ("GPLS") entered into a contract entitled "Term Sheet for Think Finance-Chippewa Cree Transaction," for a separate tribal lending venture. *See generally* Ex. 14.

32.     As reflected by the term sheet, Think Finance agreed to provide the infrastructure to run

the lending operations, including the software, "risk management, application processing, underwriting assistance, payment processing, and ongoing customer service support." *Id.* at 1.

33.    On the other hand, the Chippewa Cree Tribe agreed to commit "its best efforts" to complete certain "critical path items" within 14 days, including forming Plain Green, revising the Tribal Transaction Code to allow for the arrangement's lending products, setting up bank accounts and ACH processing for Plain Green, and obtaining separate originating and servicing addresses for Plain Green. *Id.* at 3. The Tribe further agreed to "adopt a finance code" that was "acceptable to all parties." *Id.* at 1.

34.    In return for the use of its name, Plain Green received "4.5% of cash revenue received" on the loans, as well as reimbursement for expenses. *Id.* at 2.

35.    The Chippewa Cree Tribe was also not required to contribute any of its own money to fund the loans or operations. *Id.*

36.    Rather, Defendant Haynes Investments, LLC agreed to "provide funding to the Tribe to enable it to make each of the Loans," and to fund Plain Green's bank account with "sufficient monies to fund one business day of Loans[.]" *Id.* at 1-2.

37.    Pursuant to the term sheet, "**[i]nterest rates** on the loans" would vary from "**60% to 360%** based upon the repayment history of the borrower and term of the loan." *Id.* at 1 (emphasis added).

38.    All loans originated in the name of Plain Green "had an annual percentage interest rate greater than 50%" as confirmed by Think Finance's Response to Requests for Admission in the bankruptcy matter. Ex. 9 at RFA No. 12.

39.    In addition, as discussed above, Think Finance produced "consumer-level account data" to RSM, LLP, as part of the nationwide settlement involving Think Finance, Victory Park, Great Plains, Plain Green, and others. Ex. 13 at ¶ 3.

40.    This data shows that ▮▮▮▮▮ loans were made in the name of Plain Green to California consumers during the relevant Class period. Haac Decl. at ¶ 6; Excel Exhibit 1.

41.    This data further confirms that all consumers were charged interest rates far in excess of ▮▮▮. *Id.* More specifically, Think Finance's data shows that: (1) ▮▮▮▮ loans had interest rates than ranged between ▮▮▮▮▮▮; (2) ▮▮▮▮ loans had interest rates than ranged between ▮▮▮▮▮▮; (3) ▮▮▮▮ loans

had interest rates than ranged between ███████; (4) █████ loans had interest rates than ranged between ███████; and (5) █████ loans had interest rates than ranged between ███████. *Id.*

## V.   The key contracts establishing the lending enterprises and conspiracy to make unlawful debts to consumers.

### A.   Through "Participation Agreements," the tribal entities relinquished 99% of the interest in each of the loans.

42.   On March 18, 2011, Plain Green and GPLS entered into a "Participation Agreement." *See generally* Ex. 15.[4] Similarly, Great Plains and GPLS entered into a comparable "Participation Agreement" on May 25, 2011. *See generally* Ex. 16.

43.   Through the Participation Agreements, GPLS had the unconditional right to purchase an "undivided ninety-nine percent (99%) participation interests" in the loans originated by the tribal entities, including "including any income or profits therefrom and the applicable Loan Documents." Ex. 16 at GPLV000000716; Ex. 15 at TF-VA000163.

44.   As a result, GPLS was "considered for all purposes as, the legal and equitable owner" of its 99% interest in each loan "and the associated Loan Documents… together with all of the rights, privileges and remedies applicable thereto." Ex. 16 at GPLV000000717; Ex. 15 at TF-VA000164.

45.   The participations interests were sold to GPLS at "book value" within 2 days of the origination of the loan. Ex. 16 at GPLV000000716; Ex. 15 at TF-VA000163.

46.   "Service Fee" to Plain Green in "an amount equal to 4.5% of the Cash Revenue received during each calendar month." Ex. 15 at TF-VA000163.

47.   Similarly, Great Plains received a "Service Fee" of 6% to 10%. Ex. 16 at GPLV000000716; *id.* at GPLV000000741; *see also* Ex. 17 at TF-PA-013418 (explaining flow of funds regarding "[r]evenue sharing" and that "6% (initially) of cash revenue collected will be paid from GPLS to GP Lending . . . .").

### B.   Through an Administrative Agency Agreement with GPLS, Think Finance receives the vast majority of the net income from the scheme.

48.   GPLS was "███████████████████" by Victory Park. Ex. 6 at GPLP00448768. GPLS was "a special purpose entity" that had "no employees," that was created to

---

[4] The role and purpose of GPLS is discussed in Section V.B, *supra.*

"raise[] money from investors," which was then used to make the loans through the tribal entities.  Ex. 18 at ¶¶ 2, 25, 26.

49.     As explained above, GPLS was entitled to purchase an "undivided ninety-nine percent (99%) participation interests" in the loans, "including any income or profits therefrom and the applicable Loan Documents." Ex. 16 at GPLV000000716; Ex. 15 at TF-VA000163.

50.     Through a separate agreement entitled "Administrative Agency Agreement," dated February 28, 2011, GPLS then assigned its rights to "the interest and fees received," as well as the "principal collected," on the purchased loans to TC Administrative Services ("TCAS"), a wholly owned and operated subsidiary of Think Finance. Ex. 19 at TF-VA000201 (defining the "Agent Fee" to be paid to TCAS).

51.     In return, GPLS received a "Fixed Return," which was defined as "an annual rate of return equal to twenty percent (20%) of the outstanding principal amount of" the equity investments in GPLS. *Id.* at TF-VA000202-203.

52.     Think Finance guaranteed and secured all obligations of TCAS under the Administrative Agency Agreement through a separate "Guaranty and Security Agreement." *Id.* at TF-VA000202.

**C.     Other contracts provided Think Finance with authority to handle customer support, collections, and marketing of the loans in exchange for additional revenues.**

53.     On March 18, 2011, Plain Green and Think Finance's subsidiaries entered into three other contracts entitled: (1) Servicing Agreement; (2) Marketing Agreement; and (3) License and Support Agreement. *See generally* Ex. 20; Ex. 21; Ex. 22.

54.     On May 25, 2011, Great Plains and Think Finance's subsidiaries entered into comparable agreements. *See generally* Ex. 23, Ex. 24, and Ex. 25.

55.     Under the terms of the Servicing Agreements, Plain Green and Great Plains retained TC Decision Sciences, a wholly-owned subsidiary of Think Finance, to provide: "(i) project management, (ii) support personnel, (iii) training support, (iv) the technology infrastructure, and (iv) facilities… to place outbound calls and receive inbound calls to provide customer support ***and collection services*** to a portfolio of accounts… associated with" Great Plains and Plain Green. Ex. 20 at TF-PA-001178; Ex. 23

at TF-VA000616 (emphasis added).

56.    In return, TC Decision Sciences received "five dollars ($5) per month per active Account," which was "billed on a monthly basis," and which further increased Think Finance's profits from the lending enterprises. Ex. 20 at TF-PA-001167; Ex. 23 at TF-VA000610.

57.    Under the terms of the Marketing Agreements, Think Finance's subsidiary agreed to "market Loans to prospective Applicants" via "one or more websites, search engine optimization, call centers or other marketing channels." Ex. 24 at TF-VA000594

58.    In return, Great Plains and Plain Green paid "a fee equal to One Hundred Dollars (US $100) per Loan funded." *Id.* at TF-VA000608.

59.    Under the terms of the License and Support Agreements, Plain Green and Great Plains were granted "a limited, nonexclusive, personal, revocable, non-sublicensable and nontransferable license" to use "Software" owned by TC Decision Sciences. Ex. 22 at TF-VA013139; Ex. 25 at TF-VA000581.

60.    This "Software" was Think Finance's "automated consumer credit decisioning, processing, and servicing software application," which is an "internet-based open-ended line of credit platform that permits the collection, verification, evaluation (based on criteria established by Licensee), funding, and servicing of lines of consumer credit." Ex. 22 at TF-VA013149; Ex. 25 at TF-VA000590.

**VI.    Defendants Mike and Linda Stinson's knowledge and furtherance of the conspiracy to collect usurious loans.**

**A.    The Stinson's ownership interest in Think Finance, as well as power to appoint and remove a member of the Board of Directors.**

61.     Mike and Linda Stinson are the founders of Think Finance, which began as an online lending company named Payday One. Ex. 26, L. Stinson Depo. at 20:2-9 ("Q. Okay. How did your ownership of Think Finance originate? … A. Mike -- Mike started it. Mike founded it, and I guess he put the original money in."); *id.* at 21:5-7 ("Q. Back in 2001 when the company was founded, what lines of business was the company engaged in? A. Online lending.").

62.    Over the course of several years, Mike and Linda Stinson sold various interests in the company to raise capital for it. Ex. 27, M. Stinson Depo. at 54:23-55:1 (admitting that the company "needed capital," and, thus, John Harvison's company, 7HBF, "bought 40 percent of the company").

63.     As of October 31, 2010, Linda Stinson owned approximately 20% of the shares in Think Finance. Ex. 28 at SEQ-CA0015311 (showing that Linda Stinson owned 20.49% of the shares as of October 31, 2010).

64.     At this time, the remaining shares were primarily owned by: (1) Sequoia (25.18%); (2) TCV (20.47%); (3) Defendant 7HBF (13.84%); (4) Ken Rees (6.92%); (5) Defendant Startup Capital Ventures (1.14%); (6) Defendant Steve Shaper (.28%); and (7) certain employees of Think Finance. (10.59%). *Id.*

65.     As a result of her closely held ownership interest, Linda Stinson was a party to a Voting Agreement dated March 30, 2007, as well as a "Second Amended and Restated Voting Agreement" dated May 1, 2014. Ex. 29 at SEQ-VT0001727.

66.     Under the Second Amended and Restated Voting Agreement, Linda Stinson was identified as a "Key Holder" of Think Finance. *Id.*; *see also id.* at SEQ-VT0001745 (providing an exhibit of all "Key Holders," including "Kenneth E. Rees," "Linda Stinson," the "Stinson 2009 Grantor Retained Annuity Trust," "Steve Shaper," "7HBF No.2, Ltd.," and "Startup Capital Ventures, L.P.").

67.     As a result of her key status and ownership interest, the Second Amended and Restated Voting Agreement granted Linda Stinson with unilateral authority to appoint one of the board of directors of Think Finance. *Id.* at SEQ-VT0001728 ("The four (4) 'Common Designee' shall be elected by a majority-in-interest of the Common Stock; *provided, however*, that… one (1) of the Common Designees shall be designated by Linda Stinson or her successor as permitted in accordance with Section 2(e).").

68.     As of May 1, 2014, the designee selected by Linda Stinson was Ken Rees. Ex. 122 at Stinson_0014496 ("For the purpose of this Agreement, the current directors of the Company shall be deemed to be the following Designees… Kenneth E. Rees (Linda Stinson)[.]").

69.     On May 20, 2015, Linda Stinson removed Rees as her designee and appointed her son-in-law, Tyler Head, to Think Finance's Board of Directors. Ex. 30 at Stinson_0006641 ("In accordance with Section 2(b)(iii) of the Voting Agreement, Linda Stinson hereby designates and appoints Tyler Head as a member of the Board effective as of May 20, 2015.").

**B.     Mike Stinson has judicially admitted to being a trusted individual who needed to know Think Finance's privileged information in order to ensure the proper functioning of the company.**

70.     In the related case pending in the U. S. District Court for the Eastern District of Virginia, Mike Stinson has taken the position that he was covered by the company's attorney-client privilege because "trusted individuals such as Stinson had a business need to know and possess the privileged information in order to ensure the proper functioning of Think Finance and its board." Ex. 31. Dkt. 164 at 19.

71.     In no less than four separate briefs, Mike Stinson has insisted that he "was the functional equivalent of a member of Think Finance's board of directors." Ex. 32, Dkt. 201 at 10; *see also* Ex. 33, Dkt. 209 at 5 ("Because Stinson has offered evidence to establish" that "he should be considered the 'functional equivalent' of a member of Think Finance's board of directors"); Ex. 32 at 10 ("Michael Stinson was the Functional Equivalent of a Director of Think Finance Notwithstanding his Inability to Vote or Control Think Finance."); Ex. 34, Dkt. 171 (same).

72.     In one such filing, Mike Stinson even submitted a "chart" of "evidentiary support" to support his argument that he "was the functional equivalent" of a board member. Ex. 32 at 11.

73.     This chart cites the deposition testimony of Ken Rees as "explaining that Stinson's broad contribution to the Board as an active participant" was "commensurate with any other Board member." *Id.* at 12 (citing K. Rees Dep. at 70:18-76:22).

74.     Rees further testified that Stinson was "a member of a pretty active set of board of discussions and somebody that among, you, among others, a person that I looked to for advice and counsel." Ex. 3, K. Rees Dep. at 72:10-13.

75.     Rees further testified that Mike Stinson was "actively involved in board of director meeting discussions." *Id.* at 72:14-19.

76.     Rees further admitted that Stinson would "provide his opinion on the strategic decisions of Think Finance at the board of directors meetings," *Id.* at 72:14-73-7, and described him as "somebody that cared a lot about how the company was growing." *Id.* at 74:8-18.

77.     Rees further added that it was Stinson's company "to start out with. You know, he—he founded it. It was his baby. I was actually very impressed that he was willing to transfer the CEO position to me, something I took a lot of pride in that he had that trust in my abilities. But we had a good relationship . . . I listened to him, and he felt, I think, comfortable sharing his perspective with me knowing

that I was actively looking for it." *Id.* at 74:22-75:5.

78.     Rees also described his relationship with Stinson as a "healthy mentor/mentee relationship that predated Think Finance and certainly went through" the end of Rees' "time there." *Id.* at 75:9-11.

**C.     The Stinson's knowledge of the regulatory actions against Think Finance and participation in the spinoff of the company.**

79.     By March 2012, Think Finance's leadership was concerned about the risks associated with tribal lending, prompting the creation of a PowerPoint entitled "Tribal Alternatives." Ex. 35.

80.     As this time, Think Finance was concerned that "[s]everal state AGs" were "attempting to shut down tribal lending in their states," and other states were "attempting to pass legislation that would make tribally-issued loans uncollectable in their states." *Id.* at SEQ-CA0007401.

81.     According to the Powerpoint, Think's "non-tribal options" were also "limited," such as migration to a "bank partner" or "offshore." *Id.* at SEQ-CA0007402.

82.     But the "overwhelming majority" of Think Finance's "revenue" was "coming from tribal-related lending." *Id.* at SEQ-CA0007399.

83.     Thus, one approach contemplated by Think Finance was to "[d]evelop legal 'dream team' in preparation for potential litigation from consumer groups, state AGs, FTC/CFPB." Ex. 36 at SEQ-CA0007269.

84.     On August 6, 2013, a significant threat to Think Finance came when the New York Department of Financial Services ("DFS") issued a cease and desist letter to 35 online lending companies, including Great Plains. *See, e.g.,* The Official Website of New York State, *Press Room, Cuomo Administration Demands 35 Companies Cease and Desist Offering Illegal Online Payday Loans That Harm New York Consumers* (available at: https://www.dfs.ny.gov/reports_and_publications/press_releases/pr1308061).

85.     The cease and desist was issued after an "extensive" investigation "uncovered that those companies were offering payday loans to consumers over the Internet in violation of New York law, including some loans with annual interest rates as high as 1,095 percent." *Id.* (citation omitted).

86.     In addition to the cease and desist sent to the payday lenders, the Superintendent of Financial Services, Benjamin Lawsky, also sent letters to 117 banks and the National Automated Clearinghouse Association, requesting that "they work with DFS to cut off access to New York customer

1   accounts for illegal payday lenders." *Id.*

2   87.   The following day, Ken Rees emailed Mike Stinson and other key executives and directors,

3   indicating that "the attacks on banks who provide ACH processing for tribal lending continues and seems

4   to be increasing if anything." Ex. 37 at Stinson_0035978.

5   88.   Rees's email further added "[w]e have identified 5 different litigation initiatives that may

6   slow down these efforts by agencies and hopefully bring them to the table to negotiate." *Id.* at

7   Stinson_0035979.

8   89.   In response to this news, Mike Stinson wrote an email dated August 8, 2013, opining that

9   "*I think if we can figure out ways to keep on processing payments, we should continue to have a*

10  *viable business*. Could be bloody getting there. . . This administration is just Nazi like." Ex. 38 at

11  Stinson_0011282 (emphasis added).

12  90.   One of those initiatives was an action filed on August 21, 2013, by Great Plains and the

13  Otoe-Missouria Tribe against the New York Department of Financial Services. *Otoe-Missouria Tribe v. New*

14  *York Department of Financial Services*, Case No. 1:13-cv-05930 (S.D. N.Y.).

15  91.   Although it left its name off the pleadings, Think Finance funded this litigation and

16  internally characterized it as its own. Ex. 124, K. Rees Dep. at. 94:20-95:4; *see also, e.g.,* Ex. 39 at

17  Stinson_0012891.

18  92.   Mike Stinson had knowledge of Think Finance's secret effort to attack the NYDFS as

19  evidenced by his receipt of multiple emails from Rees regarding the litigation, including an email dated

20  August 31, 2013. Ex. 40 at Stinson_0013109.

21  93.   In this correspondence, Rees (the chief executive officer and designee of Linda Stinson

22  on the board) explained: "*We* are seeking a preliminary injunction against New York State. If this is

23  granted[,] this will go a long way towards dispelling the idea that tribal loans are not legal and states can

24  squeeze companies who provide key services such as ACH processing, etc." *Id.* (emphasis added).

25  94.   On September 13, 2013, Rees provided another update to Mike Stinson and others

26  regarding the preliminary injunction hearing, explaining that the "hearing apparently went quite well. *We*

27  should know the results by mid-next week but the assumption is that at the very least, *we* won't get a

28

strongly negative ruling on *our* claim." Ex. 39 at Stinson_0012891 (emphasis added).

95.    On September 30, 2013, the district court denied the plaintiffs' request for a preliminary injunction, finding that the "undisputed facts demonstrate[d]" that the illegal activity was "taking place in New York, off of the Tribes' lands," and thus, the loans were "subject to the State's non-discriminatory anti-usury laws." *Otoe-Missouria Tribe of Indians v. NY State Dept. of Fin. Services*, 974 F. Supp. 2d 353, 361 (S.D.N.Y. 2013), *aff'd*, 769 F.3d 105 (2d Cir. 2014).

96.    The following day, Rees provided another update to Mike Stinson and others, explaining:

> The New York judge just ruled on *our* petition. While he agreed that the tribes had standing, he denied the preliminary injunction on the merits of the case. The judge seems to have focused exclusively on where the customer was physically to say New York law applied rather than deal with the inherent sovereignty issue. Obviously we believe he completely missed the mark in his decision.
>
> Whether *we* agree with the judge or not, this can only be viewed ***as a setback to our cause*** (***and the cause of tribal lending***). It will allow NY (and other states) to continue to pressure banks who provide banking services to tribes.
>
> The legal team is still meeting to discuss, but I assume *we* will appeal. *We* will likely ask the judge to review his decision based on additional information *we* think he had wrong and then look to appeal at a higher court.

Ex. 41 at Stinson_0012607 (emphasis added).

97.    Shortly after this email, Mike Stinson wrote a private email to Rees to requesting to discuss "*our* strategy now about tribal" because it "seem[ed] obvious. . . that *we* are at a very important point in determining how tribal lending does or does not fit in *our* future." Ex. 42 at Stinson_0028360 (emphasis added). This email further added: "I have some pretty strong opinions" and "would like to talk" before the board meeting "if possible." *Id.*[5]

98.    While the appeal was pending, Think Finance was following litigation against similar payday lending companies, including the action against its main competitor, CashCall, filed by the Consumer Financial Protection Bureau filed on December 16, 2013. *See CFPB v. CashCall, Inc.,* No. 1:13-cv-13167 (Mass); *see also* Ex. 6 at GPLP00448768 (███████████████████████████████████████ ████████████████████████████████████████████████████████████████████████).

---

[5] In this email and others, Plaintiffs emphasize Stinson's repeated use of possessive pronouns as it is indicative of his opinion of his and Think Finance's shared objective and mutual benefit.

99.     Two days after the CFPB filed its action against CashCall, Kenneth Rees sent another email to Mike Stinson and others, explaining:

> Some of you may have seen the action against CashCall/Western Sky yesterday. The CFPB is charging that they broke federal law by collecting on loans made by Western Sky. In particular they said that attempting to collect a loan made in violation of state usury caps is inherently an unfair, deceptive and abusive practice.
>
> This is a very disturbing new tactic from the CFPB because they appear to be trying to enforce state laws (they are supposed to be only enforcing federal law) and enacting a rate cap… through a bizarre and somewhat tortured accusation of unfair, deceptive and abusive practices.
>
> …
>
> I certainly expect CashCall to fight to the end—they have more than adequate resources to do so. As always I'll update all of you if we learn more about this case. However, *it is a strong argument for proceeding down the path we are heading with Exclaim*.

Ex. 43 at Shaper02799 (emphasis added).[6]

100.    In a private message regarding this email, another executive wrote to Mike Stinson that it was "a little scary" that the CFPB "went after the CEO personally," to which Stinson responded: "Very ugly. These folks are like Gestapo. We sure are on the right track with Exclaim." Ex. 45 at Stinson_0014567.

101.    A few weeks later, Rees sent a similar memorandum, explaining that the company was considering a "draconian organizational change," which "would spin off several products (Rise, Sunny, Elastic) to separate the tribal and non-tribal businesses." Ex. 44 at TF-VA0297706.

102.    The reason for the spinoff was to segregate "all of the (extremely profitable but) tainted assets, including all tribal-related lending products," for which "[n]o effort [would] be put into growth." Ex. 46 at SEQ-CA0017287. By contrast, all of the "good stuff," *i.e.*, the lending products and assets unconnected to the tribal products, would be moved to the "newco." *Id.*

103.    Less than a month later, Mike Stinson emailed Think Finance's lawyer indicating that his "goal" was "to help mov[e] things as quickly as possible" with "the company split." Ex. 47 at Stinson_0032466.

---

[6] "Exclaim" or "Project Exclaim" was the code word used by Think Finance when discussing the spinoff that created Elevate Credit. *See, e.g.,* Ex. 44 at TF-VA0297706.

104.    Think Finance completed the spinoff on May 1, 2014, and, as a result, all "equity holders" of Think Finance received the "same number of shares" in Elevate. Ex. 48 at SEQ-CA0017674.

105.    At this time, Linda Stinson owned 2,388,482 shares of Think Finance, *i.e.*, 19.41% of the company. Ex. 49 at SEQ-VT000001 (showing a summary of the stock ownership as of April 30, 2014).

106.    When Elevate went public in April 2017, the price of its stock was $6.50 per share.[7]

### D.    Other evidence of the Stinson's knowledge and facilitation of the scheme.

107.    In October 2010, one of Think Finance's executives, Jason Harvison, emailed Mike Stinson to discuss "tribal." Ex. 50 at Stinson_0028496. In this email, Harvison indicated that "Ken [Rees] talked to [him] yesterday about it," and that "Cash Call is doing this model." *Id.* Harvison further added that "this model will let us save our installment product earnings next year[.]" *Id.*

108.    Within a month, there was a meeting with the key holders and executives in November 2010, which was attended by Stinson. Ex. 51 at Stinson_006673.

109.    After this meeting, Mike Stinson wrote an email on November 22, 2010, regarding the "Great Plains Lending deal." *Id.* In this email, Stinson encouraged Rees and Lutes "to achieve a 'Most favored nations' status" with Great Plains "regarding ***our*** revenue share arrangement (8.5%) given the volume of business ***we*** are migrating to them." *Id.* (emphasis added).

110.    In another email dated August 19, 2011, a business associate of Stinson's asked "[d]id y'all figure out a way to get into other states for ThinkCash through offshore servicing" or "have y'all given up on that idea?" Ex. 52 at Stinson_0032432. In response, Stinson wrote: "***We're*** doing it through Native American arrangements." *Id.* (emphasis added).

111.    In August 2011, Mike Stinson also made a loan of $8,000,000 dollars to one of Think Finance's wholly owned subsidiaries, TC Loan Service. Ex. 53, Stinson's Supplemental Responses to Interrogatories, at Int. 1.

112.    By way of another example, Ken Rees emailed Mike Stinson on May 22, 2014, asking whether he was "available… to meet" to "discuss the strategic direction of Think Finance?" Ex. 54 at

---

[7] *See, e.g.,* Elevate Credit, Inc., Form S-1 Registration Statement (Sept. 2, 2015), *available at* https://www.sec.gov/Archives/edgar/data/1651094/000095012315009695/filename1.htm#toc83122_17.

Stinson_0018675. Stinson responded that he looked forward to visiting. *Id.*

113.    On April 1, 2017, Mike Stinson sent an email to Martin Wong, who took over as the chief executive officer of Think Finance after Rees, asserting that he "would be very hesitant to feel obligated to inform the tribes about ***our*** intentions. They're leaving ***us*** and one has already told ***us*** so." Ex. 55 Stinson_0013009 (emphasis added).

114.    Stinson's email further added: "I also am concerned about the Ok folks diverting ***our*** business to the Curry site. . . I understand that ***we*** are out of commission but ***we*** need to closely monitor that after we get ***our*** funding in place. We have to honorably do what ***we*** can to insure that ***we*** have a future." *Id.* (emphasis added).

115.    In addition to the shares of Elevate, the Stinson's have also received substantial proceeds through their ownership of Think Finance, including $5.5 million dollars in dividends. Ex. 53 at Int. 2.

116.    According to SCV's internal documents, Think Finance "start[ed] issuing" these "dividends to its investors to ensure all of the profits are thrown off of the company in case there [were] further issues that relate to the Consumer Financial Protection Bureau." Ex. 56 at SCV_000478.

## VII.    Defendant 7HBF's knowledge and furtherance of the conspiracy to collect usurious loans.

### A.    7HBF's ownership interest in Think Finance.

117.    When the company was still Payday One, the company "needed capital" so Mike Stinson reached out to John H. Harvison ("John Harvison"). Ex. 27, M. Stinson Dep. at 54:1-20 ("[Q.] But your wife said that you needed capital. And that's why you reached out to John Harvison; is that fair? I mean, is that true? A. That is true. Yes.").

118.    Initially, John Harvison purchased 40 percent of the stock of the company, albeit through an investment entity known as "7HBF Ltd."[8] *Id.* at 54:21-55:1 ("Q. And how much did John or his company or his investment entity invest in Payday One? A. Well, as I recall, they purchased 40 percent of the stock initially. And I can't remember what they paid for it, but they bought 40 percent of the company."); *see also* Ex. 57, Johnny Harvison Dep. at 7:17-19 (explaining that HBF stands for "Harvison Bank Funds," and that John Harvison had seven children, hence the company was named "7HBF").

---

[8] 7HBF Ltd. was the predecessor-in-interest to Defendant 7HBF No. 2, Ltd. ("7HBF").

119.   As admitted in an email from John D. Harvison ("Johnny Harvison"), the son of John Harvison and one of the managers of 7HBF, it is "a limited partnership that was formed by the Harvison Family to hold its ownership in Think Finance, Inc. The general and limited partners are all members of the Harvison Family. Think Finance stock is the only asset held by 7HBF." Ex. 58 7HBF2_0004708.

120.   Johnny Harvison testified that he, his brother Randy Harvison, and John Harvison "had authority over decision-making for 7HBF No. 2" as its managers. Ex. 57, Johnny Harvison Dep. at 36:11-37:4.

121.   As explained in another email from the "Harvison Companies Chief Financial Officer," Mark Bronson, the "*Harvison Companies were co-founders of an internet lending business ten or twelve years ago.* That evolved into Think Finance . . . a major player in the internet lending space with over $300 million in annual revenues." Ex. 59 Stinson__0033738 (emphasis added).

122.   7HBF ultimately sold portions of its stock to Ken Rees, Sequoia, and TCV at an estimated amount of more than $10 million. Ex. 57, Johnny Harvison Dep. at 76:5-77:25.

123.   As of October 31, 2010, 7HBF owned approximately 13% of the shares in Think Finance. Ex. 28 at SEQ-CA0015311 (showing that 7HBF owned "13.84%" of the shares).

124.   Like Stinson, 7HBF was a party to the Voting Agreement dated March 30, 2007, as well as a "Second Amended and Restated Voting Agreement" dated May 1, 2014. Ex. 29 at SEQ-VT0001727.

125.   Under the Second Amended and Restated Voting Agreement, 7HBF was identified as a "Key Holder" of Think Finance. *Id.*; *see also id.* at SEQ-VT0001745 (providing an exhibit of all "Key Holders," including "7HBF").

126.   As a result of its status and ownership interest, the Second Amended and Restated Voting Agreement granted 7HBF with unilateral authority to appoint one of the board of directors of Think Finance. *Id.* at SEQ-VT0001728 ("The four (4) 'Common Designee' shall be elected by a majority-in-interest of the Common Stock; provided, however, that… one (1) of the Common Designees shall be designated by 7HBF[.]")

127.   As of May 1, 2014, the designee selected by 7HBF was Jason Harvison, Johnny Harvison's son and John Harvison's grandson. *Id.* ("For the purpose of this Agreement, the current directors of the

Company shall be… Jason Harvison (7HBF No. 2)[.]").

128.   On September 18, 2015, 7HBF designated Johnny Harvison to replace Jason Harvison on Think Finance's board of directors. Ex. 60 at 7HBF2_0000369.

**B.      7HBF has judicially admitted to being an insider who needed to Think Finance's privileged information in order to ensure the proper functioning of the company.**

129.   As detailed above regarding Mike Stinson, 7HBF has also taken the position that it was covered by Think Finance's attorney-client privilege because 7HBF and its agents were "trusted individuals that had a business need to know and possess the privileged information in order to ensure the proper functioning of Think Finance and its board." Ex. 31 at 19.

130.   7HBF has further taken the position that "its employees, agents, or advisors," including John Harvison, were the "functional equivalent of a Think Finance employee, officer, or other proper party with whom Think Finance could share privileged documents." Ex 61.

**C.      Other evidence regarding 7HBF's knowledge and furtherance of the scheme.**

131.   Think Finance's Board of Director Meeting Minutes further reflect that John Harvison frequently attended board meetings pertaining to the transactions and affairs of Think Finance. *See, e.g.,* Ex. 62 at Stinson_0006009.

132.   For example, board minutes show that Harvison was present at the January 21, 2011 meeting where participants "reviewed and discussed a proposed installment loan brand and new partner" in "Great Plains Lending." *Id.* at Stinson_0006010.

133.   Board minutes from November 19, 2011, show that John Harvison attended a meeting where Rees "reviewed the operations" of Think Finance, including "the results of the various lines of business of the Company." Ex. 63 at Stinson_0017150.

134.   Board minutes from June 15, 2012, show that John Harvison attended a meeting where Rees "reviewed the operations" of Think Finance, including "the different lines of business of the Company," and updates were provided by outside counsel, "Claudia Callaway," regarding "the civil investigative demand received from the [CFPB]." Ex. 64 at Stinson_0017178.[9]

---

[9] Callaway also represented CashCall. *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *2 (C.D. Cal. Aug. 31, 2016) (granting motion for partial summary judgment and detailing the advice Callaway, including her recommendation "that her clients move to a 'tribal model,' and 'that under federal

135.    Board minutes from March 20, 2015, show that John Harvison attended a meeting where updates were provided regarding "the key themes and results of the operations of the Company," and "various legal and regulatory matters including the lawsuit filed by the Pennsylvania Attorney General." Ex. 65 at Stinson_0017318.

136.    Board meetings from July 15, 2016, show that John Harvison attended a meeting where attendees were provided updates regarding "the Company's business relationships with the tribal entities," as well as "various legal and regulatory matters affecting the Company." Ex. 66 at Stinson_0025985.

137.    Ken Rees testified that John Harvison was the person who "runs 7HBF," and "attended board meetings." Ex. 124, K. Rees Dep. at 136:20-22, 81:18-19.

138.    Rees further testified that John Harvison "would occasionally have opinions that he would share" regarding the operation of Think Finance, such as on matters related to "fundraising and financing." *Id.* at 82:1-9.

139.    Emails produced further confirm that 7HBF's managers were kept informed of regulatory efforts against Think Finance, such as the litigation with the NYDFS and the litigation involving the Pennsylvania Attorney General. Ex. 67 7HBF2_0001491 (forwarding Rees email regarding the preliminary injunction hearing); Ex. 68 7HBF2_0001478 (forwarding Rees email regarding the denial of the preliminary injunction and detailing the plan to appeal); Ex. 69 at 7HBF2_0000458 (email detailing that Victory Park would not approve dividend after the United States District Court for the Eastern District of Pennsylvania denied the motions to dismiss filed by Think Finance and Victory Park).

140.    John Harvison was also provided resumes to evaluate high-level executives of Think Finance, including its chief operating officer position. Ex. 70 at 7HBF2_00000053.

141.    7HBF's interrogatory responses further confirm that it received substantial proceeds through its ownership of Think Finance, including more than $7.5 million in dividends. Ex. 71.

142.    In addition to dividends, 7HBF owned "1,613,716" shares (*i.e.*, "13.11%") of Think Finance as of May 1, 2014, entitling it to equivalent ownership interest in Elevate. Ex. 49 at SEQ-VT0000001.

---

Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity… and the loans would not be subject to state regulation."").

VIII.   **Defendant Shaper's knowledge and furtherance of the conspiracy.**

   A.  **Shaper's Role as an Investor, Consultant, and Employee of Think Finance**

143.   Shaper is an owner, investor, consultant, and prior employee of Think Finance.[10]

144.   Shaper's ownership interest in Think Finance originated no later than 2009 when he purchased 32,092 shares of Think Finance common stock from Defendant Michael Stinson. Ex. 72, Shaper's Suppl. Response to Interrogatory No. 1.

145.   As a result of his closely held ownership interest, Shaper was a party to the "Second Amended and Restated Voting Agreement" dated May 1, 2014. Ex. 29 at SEQ-VT0001727. Under the Second Amended and Restated Voting Agreement, Shaper was identified as a "Key Holder" of Think Finance. *Id.*; *see also id.* at SEQ-VT0001745.

146.   Shaper was also an employee of Think Finance for approximately one year starting in 2011. *See* Ex. 72, Shaper's Suppl. Response to Interrogatory No. 1; Ex. 73, Shaper Dep. at 46:1-3. Soon after his employment ended, Shaper began collecting "consulting fees" from Think Finance, beginning in 2012 through at least November 2020. Ex. 73, Shaper Dep. at 43:12-14, 45:22-25. These fees were paid separately through 2015 or 2016, at which point Shaper began receiving a combined payment from Think Finance covering both "board fees" and "consulting fees." *Id.* at 43:5-19.

147.   Shaper testified that "I consulted – I was probably somewhat of a mentor to Ken [Rees]. I looked for new opportunities for the company. I participated in the daily executive committee meetings and two or three -- about two company-wide meetings that were held every quarter." *Id.* at 46:10-14. Shaper also conceded that he "was much more knowledgeable day to day than I had been just as a board member. So I was able to help in that way." *Id.* at 47:9-11.

148.   Shaper was also heavily involved in recruiting Native American Tribes to partner with Think Finance. He initially started these efforts in 2011 while he was an employee. *Id.* at 72:5-6.  For example, Shaper visited the Otoe-Missouria tribe in 2011 as part of his efforts to find tribal partners for Think Finance. *Id.* at 76: 9-17, 76:21-24.

149.   On February 10, 2011, Shaper emailed Bob Rees (of Defendant Startup Capital Ventures)

---

[10] Shaper also served on the Think Finance Board of Directors from 2007 through 2017. This suit does not seek to hold Shaper liable for decisions he made in his capacity as a Director of Think Finance.

to inform him that he was "replying to the three non-Oklahoma tribes" that Think was evaluating as potential partners in response to press coverage in the Wall Street Journal. Ex. 74, Shaper02940.

150.    On February 24, 2011, Shaper emailed Defendant Steven Haynes and Jason Harvison with details on the payment terms Think Finance would offer the Chippewa Cree tribe (Plain Green) if it became Think's "first Tribal Partner." Ex. 75, Haynes0002554. Haynes testified that Shaper "was important" and that Jason Harvison "needed Shaper's counsel, or wanted him involved in stuff," stating that he viewed Shaper as "Jason Harvison's boss." Ex. 76, Haynes Dep. at 106:1-9.

151.    Shaper was involved in the creation of the informational packets used to solicit the tribes, writing to Jason Harvison on March 17, 2011 that he wanted to revise the handouts "to emphasize those things that the folks said were most important to them." Ex. 77, Shaper03677.

152.    In a June 16, 2011 memorandum to the Board of Directors, Ken Rees praised Shaper for his role in "closing new tribes," writing that Shaper and Jason Harvison "continue to do a great job," and noting that "[i]n addition to the Plain Green (Chippewa Cree) and Great Plains (Otoe-Missouria), they have three other tribes lined up and close to signing." Ex. 79. Rees further noted that, up to that point, Shaper's "exclusive focus" had been "on tribal deals." *Id.*; *see also* Ex. 79 (March 17, 2011 memorandum offering similar praise of Shaper's efforts).

153.    Shaper continued to assist in recruiting tribes. In August 2011, Shaper emailed Jason Harvison about the "Fallon tribe's continuing interest," noting that Shaper explained that "***we*** had been very busy getting two tribes up and well on the way and ***we[']re*** now ready to spend time on their tribe." Ex. 80 (emphasis added).

154.    Shaper continued to monitor Think Finance's tribal relationships when he transitioned from salaried employee to consultant.

155.    On July 9, 2013, Shaper advised Ken Rees that Think Finance should seek to publicly minimize its control over Native American tribes, writing: "Regarding [the Native American Financial Services Association], do we really want to say that Think 'created' it? What about 'helped establish'? Don't we want to say to the world (or some regulator sometime in the future) that it was a natural outgrowth of the tribal business rather than something we created? ***We know what reality is, but do we need to say***

1  *it*" Ex. 81 (emphasis added).

2    156. Shaper routinely communicated with Martin Wong about Think Finance's tribal lending

3  business. For example, on April 29, 2014, Shaper emailed Wong, writing that he had "a lot of hope as to

4  where we can take the tribal business and want to be part of whatever you want me included in." Ex. 82;

5  *see also* Ex. 83 (May 6, 2014 email asking "how did the meeting in Ft. Worth a couple of weeks ago of all

6  three tribes go?"); Ex. 84 (June 2, 2016 email offering Shaper's  "opinions about the probable success of

7  the Montana tribe," which he formed "having observed this business closely for nearly ten years now").

8    157. In addition to his employee compensation, consulting fees, and interest from his

9  investments in GPLS, Shaper received income from the tribal lending enterprise by virtue of dividends

10  from Think Finance. Specifically, Shaper received dividend payments from Think Finance on April 13,

11  2015, in the amount of $159,286.68; on December 16, 2015, in the amount of $7,092; and on February 2,

12  2016, in the amount of $71,365. Ex. 72, Shaper's Suppl. Response to Interrogatory No. 1.

13    **B.** **Shaper reinvested in the Tribal Lending Enterprise notwithstanding his awareness**
14     **of regulatory scrutiny.**

15    158. Shaper, both individually and through the Shaper Family Partnership No. 1, Ltd., invested

16  in GPLS through VPC. He testified that he invested an initial $2 million in GPLS, which was subsequently

17  "reinvested" and grew to an investment of about $5 million. Ex. 73, Shaper Dep. at 91:16-25, 97:12-14.

18    159. The Shaper Family Partnership No. 1, Ltd. invested $1.25 million in GPLS through VPC

19  in or around February 2015. Ex. 85. It received "dividend" payments on that investment from March

20  2015 through May 2017. *Id.*; *see also* Ex. 86.

21    160. On November 17, 2015, Shaper invested in $1.2 million in GPLS on behalf of a group of

22  investors, with half of those funds coming from Shaper personally. Ex. 87, SHAPER00961. Shaper

23  received "dividend" payments on this personal investment from December 2015 through May 2017. Ex.

24  88; Ex. 89.

25    161. On December 1, 2016, during negotiations with VPC, Shaper wrote that he was "definitely

26  in for another year with the money I have in GPLS," and noted that he "may move some of that money

27  [invested in other VPC funds] to GPLS." Ex. 90.

28

IX.     **The Haynes' Defendants knowledge and furtherance of the conspiracy.**

162.    Defendant L. Stephen Haynes is the sole owner of Defendant Haynes Investments (collectively referred to herein as the "Haynes Defendants"). The Haynes Defendants' involvement with Think Finance was initiated through a meeting between Mr. Haynes and Jason Harvison set up for the purpose of Mr. Haynes helping Think Finance "find a tribal partner to partner with them in their lending business." Ex. 76, Haynes Dep. at 32:3-13; *see also* Ex. 91 Response to Int. 2.

163.    During this initial meeting, Jason Harvison walked Mr. Haynes through a PowerPoint presentation "of what he was hoping to accomplish with Native American Tribes," namely that Think Finance wanted to partner with a Native American tribe to "to provide a turnkey service so a tribe could make loans any place it wanted to" at "interest rates from 60 to 360 percent." Ex. 76, Haynes Dep. at 35:13-36:2, 38:17-39:11, 40:6-13, 44:23-23; *see also id.* at 160:16-22 and Ex. 92.

164.    Mr. Haynes presented Jason Harvison with various tribal options and then introduced the Chippewa Cree Tribe to Think Finance. Ex. 76 at 121:15-123:5; Ex. 93.

165.    The Haynes Defendants memorialized their relationship with Think Finance in an agreement that obligated Haynes Investments to "provide ongoing consulting services," defined as "services to TF [Think Finance] in connection with implementing and operating [Plain Green's lending] Program." Ex.94 at Haynes0001159, Haynes0001161.

166.    In line with this agreement, Mr. Haynes helped "collect documents and pass them along," "facilitate the communications between [Plain Green] and Think Finance," and otherwise served as "a liaison for the Tribe." Ex. 76, Haynes Dep. at 113:8-13, 123:6-14, 138:15-25; Exs. 95-98.

167.    The Haynes Defendants also entered into a Term Sheet whereby they agreed to "arrange to provide funding to the Tribe to enable it to make each of the Loans." Ex. 14. This was then memorialized via a revolving line of credit between Haynes Investments and Plain Green (and a reciprocal line of credit from Think Finance to Haynes Investments) that increased from $2 million to $20 million over time. Exs. 99-102. Pursuant to this "Credit Facility," Haynes Investments lent money to Plain Green

at a rate of "interest at [5]% per annum," which was used to fund Plain Green loan originations. *Id.*

168.    In exchange for funding Plain Green loan originations, the Haynes Defendants admittedly were paid "a significant amount of money," namely a finder's fee of 1% of gross revenues, which ultimately totaled approximately $7 million dollars. Ex. 91, Response to Int. 7; Ex. 103, 2018 Haynes Dep. at 247:16-248:22, Ex. 76, Haynes Dep. at 84:6-14, 104:2-5; *see also id.* at Ex. 75.

169.    Mr. Haynes understood "that the tribal business model of Think Finance was more profitable, more efficient, and easier to run with ACH processing" and that in order to make loans, Think Finance "needed a bank that would allow them to move money into the client's account." Ex. 76, Haynes Dep. at 91:22-25, 93:22-94:10.

170.    Mr. Haynes continued to assist Think Finance if and when needed after Plain Green was operational, including by trying to help "find potential banks" and "look for ACH and credit card processors," for which he received an additional commission. *Id.* at 184:2-186:8, 190:7-191:2, 200:1-20, 202:19-203:1, 206:25-209:8, 220:16-222:6 & Ex. 104; Exs. 105, 106-107.

171.    His testimony with respect to the interest rates on Think Finance's loans: "I didn't know where they were legal, where they weren't legal. And quite honestly, I didn't care that much about it." Ex. 76 at 198:15-21.

## IX.    Defendant SCV's knowledge and furtherance of the conspiracy to collect usurious loans.
### A.    SCV's ownership interest in Think Finance and participation in key decisions.

172.    SCV is "an early stage capital firm" that works "collaboratively alongside" entrepreneurs, such as Think Finance. Startup Capital Ventures, *Who We Are,* https://startupcv.com/ (last visited Dec. 29, 2020).

173.    SCV first invested in Think Finance (then Pay Day One) on September 28, 2005, when "SCV purchased a total of $749,992.00 of Think Finance shares." Ex. 108, SCV's 2d Supplemental Responses to Interrogatories, Resp. No. 13. In 2011, after Think Finance began its shift to the tribal lending model, SCV subsequently acquired additional "common shares from another shareholder for $5.00 per share in the amounts of approximately $102,480.00 and $2,625.00." *Id.*

174.    Bob Rees, one of the SCVs partners, is the uncle of Kenneth Rees. Ex. 109, B. Rees Dep. at 25:24-26:4. Bob Rees owns approximately 18.8% of SCV. SCV's managing partner John Dean owns 25.07% of SCV through Dean Investments, LP, and SCV's CFO Amy Young owns 1.25% of SCV. Ex. 108, Response to Int. 1.

175.    Similar to other owners of Think Finance, SCV was a party to the "Second Amended and Restated Voting Agreement" dated May 1, 2014. Ex. 29 at SEQ-VT0001727.

176.    Under the Second Amended and Restated Voting Agreement, SCV was identified as a "Key Holder" of Think Finance. *Id.*; *see also id.* at SEQ-VT0001745 (providing an exhibit of all "Key Holders," including SCV).

177.    Like the other owners of the business, Startup Capital Ventures supervised the activities of Think Finance and provided input on key decisions with respect to the business.

178.    Think Finance executives would seek guidance and involvement from SCV's partners, including John Dean. For example, on October 25, 2011, John Dean agreed to a request from Ken Rees that Dean interview a potential Think Finance board member, Steve Galasso. Ex. 110.

179.    On August 10, 2012, Ken Rees emailed John Dean and others with a "current list of key job descriptions at Think Finance" in case Dean and others "might know people who would be a good fit." *See, e.g.,* Ex. 111.

180.    On June 3, 2014, Bob Rees emailed Martin Wong, Ken Rees, and Steve Shaper to provide his feedback on scenarios for Think Finance after the initiation of the *Otoe-Missouria* litigation and the increasing regulatory pressure. Specifically, Rees opposed winding down Think Finance's operations, arguing: "Based on these numbers, it's difficult for me to see why TF would wind down unless forced to do so." Ex. 112.

181.    In this email, Bob Rees further added that "'Steady state' mode would seem to be a bit of an arbitrary restriction; so I don't see why we wouldn't try for the 'upside' scenario with the caveat that we may need to slow down or even wind down depending on specific regulatory circumstances that time may dictate." *Id.*

182.    In August 2015, SCV also referred Think Finance to Macquarie, a multinational

investment bank, as "an alternative or enhancement" to the funding provided by Victory Park—although it ultimately proved unsuccessful. Ex. 113.

183.    SCV was represented on the Think Finance Board at various times by either John Dean or Bob Rees. However, SCV still had its CFO, Amy Young, phone in to board meetings until Martin Wong requested that she stop in July 2017 because "there are evidently two board members . . . who are uncomfortable with someone on the phone, who they do not know, listening in to so much sensitive information. I assured Martin that Amy is representing SCV . . ." Ex. 114.

184.    SCV used the board fees paid by Think Finance, which were approximately $72,000 per year, to ensure SCV could continue operating certain investment vehicles by using those fees "to build a reserve fund for when Think and / or Elevate go away." Ex. 115.

**B.    SCV's awareness of regulatory actions targeting Think Finance, and its approval of the Elevate spin-off.**

185.    SCV concedes that it was aware of the regulatory risk of Think Finance's business model from the beginning: "While it was known that the company since its inception dealt with regulatory risks, SCV's partners were comfortable with Think Finance's business because of John Dean's experience in the banking and financial services industry." Ex. 108, Response to Int. 8.

186.    Bob Rees updated SCV's other partners regularly on Think Finance's business and the regulatory risks and enforcement actions it faced. *See, e.g.*, Ex. 116 (August 7, 2012 email from Bob Rees providing update that "CFPB has sent out CID letters to a ton of financial services companies; TF was not alone in being targeted (good news)"); Ex. 117 (February 15, 2013 email from Bob Rees informing SCV partners that "[t]he regulatory risk from [the CFPB] continues to be a big issue for the company" and stating that "John [Dean] may have more information for us after his one-on-one dinner tonight with CFO Chris Lutes"); Ex. 118 (September 21, 2013 email from Bob Rees providing an update on ACH providers in light of New York Attorney General lawsuit); Ex. 119 (October 18, 2013 email from Bob Rees providing update on New York enforcement activity against "the company's tribal lending partners" and challenges Think has had with its ACH providers as a result).

187.    On January 22, 2014, Bob Rees again emailed SCV's other partners to update them on the plans for the Elevate spin-off, writing that "[t]his reorg is to help the company better deal with potential

regulatory issues." Ex. 120.

188.    As a "Key Holder" of Think Finance shares, on or around May 14, 2014, SCV (through John Dean) signed a Right of First Refusal and Co-Sale Agreement in order to effectuate the spin-off of Think Finance's non-tribal business to Elevate Credit, Inc. Ex. 121.

189.    SCV received 142,362 shares in Elevate as a result of the spin-off.[11]

190.    In an April 23, 2015 email, Amy Young confirmed to SCV's partners that Think Finance's "tribal lending model" brought "a higher degree of regulatory risk" and thus was "unlikely to go public," confirming that "[t]his was the primary reason for the spin-off discussed above." Ex. 123 at SHAPER01902.

## ARGUMENT

**I.    Summary judgment should be granted that the choice-of-law clauses are unenforceable.**

The Supreme Court has repeatedly recognized that where "choice-of-forum and choice-of-law clauses" operate "in tandem as a prospective waiver of a party's right to pursue statutory remedies," they are unenforceable. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985); *see also Am. Exp. Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2313–14 (2013) ("[C]ourts will not enforce a prospective waiver of the right to gain redress for an antitrust injury, whether in an arbitration agreement or *any other contract*." (emphasis added)). Over two years ago, this Court thoroughly considered this precise issue when the Haynes Defendants argued that the choice-of-law provisions in the Plain Green and Great Plains' loan contracts governed and required dismissal of the claims. *Brice*, 372 F. Supp. 3d at 982. In rejecting this argument, the Court held that "the choice-of-law provisions in the agreements at issue are unenforceable prospective waivers." *Id.* The Court reached this conclusion after thoroughly considering the language of the contracts, as well as multiple "decisions from other circuits and district courts" interpreting "materially similar language." *Id.* Nothing has changed since the Court made this earlier ruling, which characterized the choice-of-law provisions as "wholly unenforceable." *Id.*

Indeed, since the Court reached its conclusion, the United States District Court for the Eastern

---

[11] *See* Elevate Credit, Inc., Form S-1 Registration Statement (September 2, 2015), *available at* https://www.sec.gov/Archives/edgar/data/1651094/000095012315009695/filename1.htm#toc83122_17

District of Virginia, the Fourth Circuit, and Second Circuit have similarly interpreted the contract, including in two cases involving these very same defendants (and defense team). *See generally Gibbs v. Haynes Invs., LLC*, 368 F. Supp. 3d 901 (E.D. Va. 2019), *aff'd*, 967 F.3d 332 (4th Cir. 2020); *Gibbs v. Stinson*, 421 F. Supp. 3d 267, 277 (E.D. Va. 2019), *aff'd sub nom. Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286 (4th Cir. 2020); *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 128 (2d Cir. 2019), *cert. denied sub nom. Sequoia Cap. Operations, LLC v. Gingras*, 140 S. Ct. 856 (2020). For example, the Fourth Circuit held that, even though "the Plain Green and Great Plains arbitration agreements do not explicitly preclude the application of federal law," they nonetheless "violate the prospective waiver doctrine by providing that tribal law preempts the application of contrary law, including any contrary federal statutory law, such that a plaintiff would be unable to effectively vindicate certain federal statutory claims." *Haynes*, 967 F.3d at 342.

In addition to the language of the contract, the Fourth Circuit also concluded that a review of the tribal law reinforced its conclusion because "the relevant tribal codes would not permit" a borrower "to effectively vindicate the federal protections and remedies they seek." *Compare Id.* at 343; *with Brice*, 372 F. Supp. 3d at 973 ("Tribal Laws Do Not Provide Remedies for Plaintiffs' Statutory Claims."). In particular, the Fourth Circuit took issue with three features of the tribal code. *Haynes*, 967 F.3d at 343. *First*, the Fourth Circuit observed that "although § 5.1 of the Otoe-Missouria Tribal Consumer Financial Services Ordinance" provided that lenders shall comply with "federal laws as applicable," that RICO was "noticeably absent from the list of federal consumer protection statutes with which a lender must comply." *Id.* at 343 (citing *Otoe-Missouria Tribal Consumer Fin. Servs. Ord.* §§ 5.2(a) (2018)). "And even for the laws listed," the Fourth Circuit noted that the "Ordinance makes clear that a lender's compliance does not constitute 'consent . . . related to the applicability of federal laws[.]" *Id.* (citing § 5.2(a)).

*Second*, although tribal law allowed for a claim against the lending entity, the Fourth Circuit further found a prospective waiver occurred because tribal law did not allow for claims against individuals or non-tribal entities. In particular, the Fourth Circuit explained: "[A] borrower's ability to assert a federal statutory claim under tribal law against an individual or entity (such as the Haynes Defendants) related to a lender remains even more elusive: although the Ordinance governs 'licensed lenders' and mandates their compliance with tribal and applicable federal law, it says nothing about non-tribal entities or individuals

associated with the lenders who may have violated RICO." *Id.* at 333.

*Third*, "even if the borrowers could assert a RICO claim against the Haynes Defendants under tribal law," the Fourth Circuit concluded that "the rest of the Ordinance fail[ed] to clarify how any consumer could meaningfully pursue any claims under it." *Id.* at 344. Stated differently, "[a]lthough the Ordinance contain[ed] a consumer complaint procedure," the tribal code "does not provide for or establish a private right of action for violations of any provisions, let alone any federal laws." *Id.* (citing §§ 8.1-8.4). Similarly, the Fourth Circuit noted that "the Chippewa Code contains a single 'civil remedies' provision limiting a defendant's liability to 'actual damages' for 'intentional[]' violations," and that this "does not permit a borrower to effectively vindicate a federal statutory claim for treble damages, as would be permitted under RICO." *Id.* (quoting Chippewa Cree Regulatory Code § 10-6-201 (2017)).

"Choice of law determinations, as well as contract interpretation issues, are pure legal questions well-suited to summary judgment." *Flintkote Co. v. Aviva PLC*, 177 F.Supp.3d 1165, 1172 (N.D. Cal. 2016) (citing *Shannon–Vail Five Inc. v. Bunch*, 270 F.3d 1207, 1210 (9th Cir. 2001)). Because the choice-of-law clauses prospectively waives federal rights as previously determined by this Court, summary judgment should be granted on this issue.

## II. Summary judgment should be granted with respect to Plaintiffs' claim that California law applies to the loans.

"Because the Court's jurisdiction is premised on federal question jurisdiction" under RICO, "federal common law supplies the choice-of-law rules." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *5 (C.D. Cal. Aug. 31, 2016) (citing *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006)). In the absence of an enforceable choice of law provision, "[f]ederal common law follows the approach outlined in the Restatement (Second) of Conflicts of Law." *Id.* (citing *Huynh*, 465 F.3d at 997). Under this approach, California law applies to the loan contracts for two reasons (at least).

*First*, under § 188 of the Restatement, the law that applies is determined by the state which "has the most significant relationship to the transaction and the parties." *Id.* (quoting Restatement of Conflicts § 188(1)). In making the "most significant relationship" determination, the Restatement provides the following non-exhaustive factors to consider: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e)

the domicil[e], residence, nationality, place of incorporation and place of business of the parties." *Id.* (quoting Restatement § 188(2)). Here, examination of each of these contacts unquestionably demonstrates that California has a "more significant relationship" with the transaction than the Tribes.

California has a more significant relationship to the transaction because the "borrowers were citizens or residents" of California, "the borrowers applied for the loans from their home states, the funds were received by the borrowers in their home states, and borrowers made payments on their loans from their home states." *Consumer Fin. Prot. Bureau*, 2016 WL 4820635, at *8; *MacDonald v. CashCall, Inc*, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017) (finding same with respect to New Jersey consumer); *United States v. Moseley*, 980 F.3d 9, 23 (2d Cir. 2020) (finding that, in the absence of an enforceable choice-of-law provision, that New York was the center of gravity because it was the "domiciles of many borrowers and the subject matter of the contract: loans and payments that affected the borrowers individually in New York in a direct way. The loan proceeds were received in New York and repaid from New York.").[12]

The analysis would be quite different if borrowers physically traveled to the Tribe's reservation, such as when a person gambles at a tribal casino. But when it comes "to interstate contractual obligations" parties "who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985) (citations omitted). Beyond this, an abundance of evidence shows that Great Plains and Plain Green were created and operated to allow Think Finance to attempt to evade state usury laws. *See, e.g.*, Exs. 6-7. In light of Think Finance's dominant role in the creation and operation of the lending enterprise, as well as its predominant economic interest in loans, the Tribe's relationship is de minimis. Put differently, as stated by the Second Circuit: "a tribe has no legitimate interest in selling an opportunity to evade state law." *Otoe-Missouria*, 769 F.3d at 114.

***Second***, California should apply to the agreements because "[t]here is no viable alternative,"

---

[12] *See also United States v. Hallinan*, 2016 WL 7477767, at *1 (E.D. Pa. Dec. 29, 2016) ("Because the loans at issue involve activity that takes place, at least in part, off a reservation, state law still applies."); *Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1304 (10th Cir. 2008) (finding that usury statutes regulated in-state activity where Utah-based lender made loans over the internet to residents in Kansas); *State ex rel. Swanson v. Integrity Advance, LLC*, 846 N.W.2d 435, 442 (Minn. Ct. App. 2014) (holding that "extension of payday loans to Minnesota residents did not occur wholly outside Minnesota's borders" thereby requiring online lender from Utah to comply with lending statutes).

*Gingras v. Rosette*, 2016 WL 2932163, at *15 (D. Vt. May 18, 2016), since the tribal law itself violates the prospective waiver doctrine as previously determined by the Court. *Brice*, 372 F. Supp. 3d at 973. Where, as here, a choice-of-law provision is unenforceable provision because the chosen law itself violates the prospective waiver doctrine, it naturally flows that it cannot be applied as a default under § 188. Put differently, implicit in the § 188 analysis is the availability of two enforceable governing laws. But here, California is the only option because the tribal law itself is unenforceable because it would not permit borrowers "to effectively vindicate the federal protections and remedies they seek." *Haynes*, 967 F.3d at 343; *see also Brice*, 372 F. Supp. 3d at 973 ("Tribal Laws Do Not Provide Remedies for Plaintiffs' Statutory Claims.").

## III. Summary judgment should be granted to Plaintiffs and the Class Members as to the Defendants' affirmative defense that tribal immunity applies to the loans.

The Court should also grant summary judgment on Defendants' third affirmative defense that a "cause of action based on lending by Native American tribal entities" is "barred by the operation of Tribal immunity." *See, e.g.*, SCV's Ans., Dkt. 87 at pg. 38; Dkt. Nos. 112-115 (same for other defendants). This affirmative defense demonstrates a fundamental misunderstanding of sovereign immunity and, thus, its lack of any impact on Plaintiffs' and the Class Members' claims. Under Defendants' theory, tribal sovereign immunity provides tribal businesses, as well as those that partner with them, with a free pass to violate state laws with impunity.

Defendants are simply wrong as a matter of law—the Supreme Court has held and consistently reaffirmed that "[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973) (citing *Puyallup Tribe v. Department of Game*, 391 U.S. 392, 398 (1968)).[13] Put differently, tribal immunity "limits how states can enforce their laws against tribes or arms of the tribes, but . . . it does not transfigure debts that are otherwise unlawful under RICO into lawful ones." *Neff*, 787 F. App'x at 92; *see also Fla. Paraplegic Ass'n, Inc. v. Miccosukee Tribe*

---

[13] *See also Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 795 (2014) ("Unless federal law provides differently, 'Indians going beyond reservation boundaries' are subject to any generally applicable state law.") (quoting *Mescalero*, 411 U.S. at 148-49); *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 465 (1995) (same).

*of Indians*, 166 F.3d 1126, 1130 (11th Cir. 1999) ("[W]hether an Indian tribe is *subject* to a statute and whether the tribe may be *sued* for violating the statute are *two entirely different questions*.") (emphasis added); *Gingras*, 922 F.3d at 128 ("[t]ribes and their officers are not free to operate outside of Indian lands without conforming their conduct in these areas to federal and state law.").

Moreover, the Supreme Court has expressly acknowledged that there are a "panoply of tools" available to "shutter, quickly and permanently" unlawful conduct involving tribes. *Bay Mills*, 572 U.S. at 796. Most notably, "tribal immunity does not bar [] a suit for *injunctive* relief against individuals, including tribal officers, responsible for unlawful conduct." *Id.* (emphasis added) (citations omitted). Tribal sovereign immunity is also "simply not in play" in an "individual-capacity damages" action "against tribal employees for torts committed within the scope of their employment." *Lewis v. Clarke*, 137 S. Ct. 1285, 1290-1291 (2017). In other words, tribal sovereign immunity "does not erect a barrier against suits to impose *individual* and *personal* liability," it only applies to governmental liability. *Id.* at 1291.

From these principles, it naturally flows that sovereign immunity neither protects nor legalizes the conduct of Defendants or bars a cause of action against non-tribal members who partner with Tribes. The ongoing case against Defendants—the founders and generals behind this scheme—is one of many panoply of tools available to shutter this unlawful conduct and obtain recourse for those who have repaid amounts on these illegal loans. *Bay Mills*, 572 U.S. at 796.

**IV.     Summary judgment should be granted as to each element of the RICO conspiracy claim.**

RICO generally prohibits four types of activities: (1) § 1962(a) prohibits a person who has received income through the collection of an unlawful debt from investing any of that income in the enterprise; (2) § 1962(b) prohibits a person from maintaining control over an enterprise through the unlawful collection of debt; (3) § 1962(c) prohibits a person from conducting the affairs of an enterprise through the collection of unlawful debt; (4) § 1962(d) prohibits any person from conspiring to commit any of the provisions in §§ 1962(a)-(c). 18 U.S.C. § 1962(a)-(d). RICO defines "unlawful debt" as a debt that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

Under § 1962(d), the RICO conspiracy statute, "there is no requirement of some overt act or

specific act." *Salinas*, 522 U.S. at 63. Instead, a person may be liable as a co-conspirator "even if" they do not "agree to commit or facilitate each and every part of the substantive offense." *Id.* (citation omitted). This means that a person "may be liable for conspiracy even though he was incapable of committing the substantive offense." *Id.* at 64. If one person commits a substantive violation of RICO, another person may be held liable if he "knew about and agreed to facilitate the scheme." *Id.* at 66; *see also Christensen*, 828 F.3d at 780 ("[A] RICO conspiracy under § 1962(d) requires only that the defendant was 'aware of the essential nature and scope of the enterprise and intended to participate in it.'") (quoting *United States v. Fernandez*, 388 F.3d 1199, 1221 (9th Cir. 2004)). Each of these elements are satisfied in this case.[14]

### A.     The evidence shows that Defendants knew about the scheme.

The "point of making" a plaintiff show that conspirators had "some knowledge of the nature of the enterprise[] is to avoid an unjust association" of a conspirator who inadvertently facilitates a scheme, such as an internet provider. *Christensen*, 828 F.3d at 780 (quoting *United States v. Brandao*, 539 F.3d 44, 52 (1st Cir. 2008)). Nonetheless, the Supreme Court has held that "the definition of a RICO enterprise has 'wide reach' and is to be liberally construed to effectuate its remedial purposes." *Id.* (quoting *Boyle v. United States*, 556 U.S. 938, 943–44 (2009)). This wide reach "is woven tightly to trap even the smallest fish," including "those peripherally involved with the enterprise." *Christensen*, 828 F.3d at 780 (citation omitted).

Here, no reasonable jury could find that Defendants did not have knowledge of the scheme. *See* KNOWLEDGE, Black's Law Dictionary (11th ed. 2019) (defining the word as "[a]n awareness or understanding of a fact or circumstance; a state of mind in which a person has no substantial doubt about the existence of a fact."). As reflected by the Statement of Material Facts, the discovery in this case confirms that each defendant had an awareness and understanding of the scheme.

For example, the evidence as to Mike and Linda Stinson unquestionably demonstrates that: (1)

---

[14] As detailed in Sections IV.C-E, *infra*, the evidence also establishes that some members of this conspiracy committed substantive violations of RICO, *i.e.*, conducting the affairs of an enterprise engaged in the collection of unlawful debt. Because no reasonable jury could conclude otherwise, Plaintiffs request summary judgment, in whole or in part, that: (1) Defendants knew and agreed to facilitate the scheme in violation of § 1692(d); and (2) members of the enterprise committed a violation of § 1692(c). *See United States v. Williams*, 974 F.3d 320, 369 (3d Cir. 2020) ("A defendant may be a party to the enterprise, not violate § 1962(c), but still be liable under § 1962(d). . . . It is enough that the defendant "knew about and agreed to facilitate the scheme" which at least would have resulted in the satisfaction of § 1962(c)'s elements.") (quoting *Salinas*, 522 U.S. at 66).

they started Think Finance as an online lending company (Ex. 26); (2) Linda Stinson was a party to the "Second Amended and Restated Voting Agreement," which identified her as a "Key Holder," and provided her with unilateral authority to appoint one of the company's board members (Ex. 29); (3) Mike Stinson attended numerous board of directors meetings as an "observer," where operational and regulatory issues related to the scheme were discussed (Exs. 62-66); (4) Mike Stinson was routinely copied on emails regarding the scheme, including initial emails regarding the negotiation of the initial venture (Ex. 51).

Similarly, the evidence further demonstrates that 7HBF and its owner were: (1) "co-founders of an internet lending business ten or twelve years ago," (Ex. 59); (2) 7HBF was a party to the "Second Amended and Restated Voting Agreement," which identified it as a "Key Holder," and provided it with unilateral authority to appoint one of the company's board members (Ex. 29); (3) John Harvison attended numerous board of directors meetings as an "observer," where operational and regulatory issues related to the scheme were discussed (Exs. 62-66); and (4) John Harvison was routinely copied on emails regarding the scheme, such as Think Finance's secret litigation against the NYDFS (Exs. 67-69).

Plaintiffs likewise offer ample indisputable evidence that Defendants Shaper, Haynes, and SCV likewise had knowledge of the scheme. Statement of Facts, *supra*; *see also, e.g.,* Ex. 73, Shaper Dep. at 46:10-14 (testifying that he was a mentor to Ken Rees); Ex. 74 (email regarding Shaper's communications with three tribes that Think Finance was evaluating as potential partners); Ex. 78 (email from Rees praised Shaper for his role in "closing new tribes," writing that Shaper "continue[s] to do a great job," and noting that "[i]n addition to the Plain Green (Chippewa Cree) and Great Plains (Otoe-Missouria), they have three other tribes lined up and close to signing."); Ex. 82 (email from Shaper to Wong stating that Shaper has a lot of hope" for tribal business and "want to be a part of whatever you want me included in."); *see also* Ex. 14 (term sheet showing the Haynes Defendants' agreement "to provide funding to the Tribe to enable it to make each of the Loans."); *id.* (showing the loans would be offered at interest rates of "60% to 360%"); *see also* Ex. 29 (identifying SCV as a "Key Holder" of Think Finance); Ex. 112 (email from Bob Rees asserting that "it's difficult for me to see why TF would wind down unless forced to do so" despite the regulatory pressures); Ex. 114 (attending Amy Young attended board meetings "representing SCV."); Ex.

123 at Shaper01902 (Email from Amy Young to SCV's partners explaining that "Think Finance, on the other hand, uses a tribal lending model that allows it to do online lending in all 50 states.").

In sum, the evidence shows that Defendants had knowledge about Think Finance's tribal lending scheme. Because no reasonable juror could conclude otherwise, summary judgment should be awarded as to this element of the § 1962(d) claim.

**B.    The evidence shows that Defendants furthered the scheme and knowingly accepted millions of dollars in benefits from it.**

In addition to the knowledge requirement, a person must "adopt the goal of furthering or facilitating" the scheme to violate § 1962(d). *Salinas*, 522 U.S. at 63. A conspirator "may do so in any number of ways short of agreeing to undertake all of the acts necessary" for the completion of the substantive violation. *Id.* at 65. One such way could be proven "by evidence that the defendant agreed to facilitate a scheme by providing tools, equipment, cover, or space; [and] that the facilitation was knowing because the defendant was aware of the broader scheme, even if he was unaware of the particulars[.]" *United States v. Zemlyansky*, 908 F.3d 1, 12 n.6 (2d Cir. 2018). Another way would be showing that "the defendant knowingly benefitted from the scheme; and that other members of the enterprise intended to accomplish specific predicates." *Id.*

Based on the evidence in this case, no reasonable jury could find that Defendants did not agree to facilitate Think Finance in its tribal lending endeavor. For example, the evidence as to Mike and Linda Stinson unquestionably demonstrates that: (1) Linda Stinson had the unilateral authority to appoint and remove a member of Think Finance's board of directors, *i.e.*, one of the very people tasked with running the company (Ex. 29); (2) Linda Stinson appointed Ken Rees—one of the key participants—as her designee on the board of directors (Ex. 122); (3) Mike Stinson has judicially admitted to being a "trusted individual[]" that had "a business need to know and possess the privileged information" of Think Finance "to ensure the proper functioning" of the company and "its board" (Ex. 31); (4) Rees testified that Mike Stinson provided "his opinion on the strategic decisions of Think Finance at the board of directors meetings," (Ex. 124, K. Rees Dep. 72:14-19), and documents confirm the same (Ex. 54 at Stinson 18675) (email from Rees to Stinson regarding a time to meet to "discuss the strategic direction of Think Finance?"); and (5) Stinson also provided an $8 million-dollar loan to Think (Ex. 53) And tellingly, Mike

Stinson routinely used possessive pronouns when discussing the operations of Think Finance, thereby demonstrating his shared objective in furthering the schemes of the enterprise. *See, e.g.*, Ex. 45 at Stinson_0014567 (email from Stinson asserting that "[w]e sure are on the right track with" the spinoff in light of CFPB's action against CashCall's owner); Ex. 38 (asserting that "if we can figure out ways to keep on processing payments, we should continue to have a viable business."); Exs. 42, 51, 52, 55 (similar).

Similarly, the evidence as to 7HBF unquestionably demonstrates that: (1) 7HBF had the unilateral authority to appoint and remove a member of Think Finance's board of directors, *i.e.*, one of the very people tasked with running the company (Ex. 29); (2) 7HBF appointed Jason Harvison—one of the grandchildren of 7HBF's owner—as its designee on the board of directors (*Id.*); (3) taken the position that "its employees, agents, or advisors," including John Harvison, were the "functional equivalent of a Think Finance employee, officer, or other proper party with whom Think Finance could share privileged documents" to ensure the proper function of the company; (4) John Harvison "would occasionally have opinions that he would share" regarding the operation of Think Finance, such as on matters related to "fundraising and financing" (Ex. 124, K. Rees Dep. 82:1-9); (5) 7HBF received substantial proceeds as a result of the tribal lending scheme, including $7.5 million in dividends; (6) John Harvison was kept informed of regulatory efforts against Think Finance, such as the litigation with the New York Department of Financial Services and the litigation involving the Pennsylvania Attorney General (Ex. 67); (Ex. 69 at 7HBF2_0000458); and (7) 7HBF knowingly participated in the dubious spinoff and retained the benefits therefrom, including receipt of 13% of Elevate (Ex. 48 at SEQ-CA0017674).

Likewise, Defendant Shaper facilitated the scheme through his extensive outreach to Native American tribes, his reinvestment in GPLS, and his mentoring of Ken Rees. Shaper02940 (email regarding Shaper's communications with three tribes that Think Finance was evaluating as potential partners); Ex. 78 at SEQ-CA0021220 (email from Rees praised Shaper for his role in "closing new tribes," writing that Shaper and Jason Harvison "continue to do a great job," and noting that "[i]n addition to the Plain Green (Chippewa Cree) and Great Plains (Otoe-Missouria), they have three other tribes lined up and close to signing."); Ex. 73 (showing one of Shaper's multi-million dollar investments in GPLS, which was then used as capital to make the loans). The evidence further shows that Shaper "wanted to be a part of

1   whatever" Think Finance wanted him to be "included in." Ex. 82, Shaper03453.

2       Similarly, the evidence as to the Haynes Defendants shows that: (1) Haynes Investments was a

3   party to the "Term Sheet for Think Finance-Chippewa Cree Transaction," pursuant to which Haynes

4   Investments agreed to "provide funding to the Tribe to enable it to make each of the Loans," and to fund

5   Plain Green's bank account with "sufficient monies to fund one business day of Loans based upon the

6   average Loan volumes for the preceding month" (Ex. 14); (2) Stephen Haynes signed this term sheet on

7   behalf of Haynes Investments; and (3) the Haynes Defendants agreed to the term that "[i]nterest rates on

8   the loans" would vary from "60% to 360%" (Ex. 76); (4) that the Haynes Defendants entered into the

9   credit facility agreements, one of which created a $20 million dollar line of credit used to make the loans

10  in the name of Plain Green (Exs. 99-102); and (5) that the Haynes Defendants received $7 million dollars

11  as a result of their role (Ex. 91, Response to Int. 7; Ex. 103, 2018 Haynes Dep. at 247:16-248:22, Ex. 76,

12  Haynes Dep. at 84:6-14, 104:2-5; *see also id.* at Ex. 75).

13      Similarly, the evidence shows that SCV attempted to further the scheme by numerous acts. Ex.

14  113 at SCV000080 (document showing that SCV referred Think to a multinational investment bank as

15  "an alternative or enhancement" to the funding provided by Victory Park); Ex. 115 (showing that SCV—

16  not any one of its individual partners—received the $72,000 per year in board member fees); Ex. 121

17  (identifying SCV as a "Key Holder" and requiring it to vote in a certain manner with respect to the board);

18  Ex. 112 (email from Bob Rees encouraging Think's executives to stay in the business because "it's difficult

19  for [him] to see why TF would wind down unless forced to do so" despite the regulatory pressures).

20      In sum, the evidence shows that each Defendant took numerous steps to further the success and

21  affairs of Think Finance, a company whose primary purpose prior to the spinoff—and *sole purpose after*—

22  was engaging in the tribal lending scheme. Because Think Finance engaged solely in these illegal activities,

23  all acts taken on its behalf by Defendants were to facilitate the essential plan of collecting usurious loans

24  through the tribal lending model. At the highest level, Defendants Mike Stinson, Linda Stinson, and 7HBF

25  were involved in the creation and strategic direction of the company, including appointment of the

26  individuals carrying out its day-to-day activities. Defendant SCV provided strategic guidance to Think

27  Finance's leadership. And, at the ground level, the Haynes Defendants played an integral role by funding

28

each of the loans originated by Plain Green, and Defendant Shaper was crucial in recruiting Think Finance's tribal partners and invested in GPLS. While some were "generals" and others were more of "foot soldiers," RICO imposes liability on all persons who know about and further the scheme. What happened here was not a company's secret side business or unauthorized acts carried out by a few rogue executives unbeknownst to the owners of the company. Instead, it was a widespread and intentional effort to circumvent state usury laws, which was furthered from top to bottom of Think Finance.

## V.   Summary judgment should be awarded that a violation of § 1962(c) occurred, which was the object of Defendants' RICO conspiracy.

### A.   Summary judgment should be awarded that an enterprise existed.

RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union *or* group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1691(4) (emphasis added). The Supreme Court's decision in *Boyle*, recognized that RICO's definition of enterprise was "obviously broad" and included an "association in fact" enterprise. 556 U.S. at 944. Put differently, an enterprise may be a legally recognized entity like a corporation or an "association in fact enterprise," *i.e.*, "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981); *Boyle*, 556 U.S. at 948 ("[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose.").

The *Boyle* decision noted that "the very concept of an association in fact is expansive" and that the terms of RICO are "to be 'liberally construed to effectuate its remedial purposes.'" 556 U.S. at 948 (quoting Pub.L. 91–452, § 904(a), 84 Stat. 947). To that end, the Supreme Court has held that an association-in-fact enterprise merely requires three structural features: **(1)** a purpose, **(2)** relationships among those associated with the enterprise, and **(3)** longevity sufficient to permit these associates to pursue the enterprise's purpose. *Id.* at 946. Indisputable evidence establishes each one of these features.

**First**, the evidence establishes the purpose of the enterprise. The purpose requirement merely requires that the enterprise include a common interest or purpose. *See Id.* Evidence that "association-in-fact members actively associate with one another and work cooperatively and illegally to achieve a goal" is sufficient. *See Allstate Ins. Co. v. Benhamou*, 190 F. Supp. 3d 631, 653 (S.D. Tex. 2016). Further, "[i]nterdependent and coordinated associations that exist to perpetuate the enterprise and its profitability

likewise satisfy the common-purpose structural element." *Benhamou*, 190 F. Supp. 3d at 653.

Here, the evidence shows that the purpose of this enterprise was to engage in the making and collection of high-interest short term loans. Among other things, the evidence shows that Think Finance had a relationship with FBD where it participated in the making of "short-term (4-24 months), high interest installment loans (87-334% APR)." Ex. 2 at TF-PA-504638. The evidence—such as a contemporaneous email from Rees in October 2010—further shows that FBD terminated the program because "regulators" decided "to shut down any programs like [theirs]." Ex. 4 at SEQ-CA0002122; *see also* Ex. 5 at TF-VA0230475, Nov. 2012 Email from Kenneth Rees ("The FDIC forced [First Bank of Delaware] to terminate [Think's product] and the eventual implications were obvious."). Contemporaneous evidence further shows that ████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████ Ex. 6 at GPLP00448768.

This new structure was origination of the loans using a tribal lending entity as the conduit for the loans under the theory that sovereign immunity would not subject the loans to state law. *See, e.g.*, Ex. 124, K. Rees Dep. at 158:2-10. Pursuant to this theory, Think Finance solicited potential tribes to participate in the lending venture, claiming that "[o]nline emergency cash lending" represented "a significant opportunity for increased tribal revenue" and that Think Finance had "a unique turnkey solution for helping tribes enter this lucrative market." Ex. 7 at TF-VA0290545. The common purpose of the enterprise is extensively documented in the communications presentations, and the series of agreements that were extensively outlined in the Statement of Facts. It may also be inferred from the conduct. *See Boyle*, 556 U.S. at 947 (concluding that the existence of an enterprise may be "inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity").

**Second**, the evidence establishes the relationships among those associated with the enterprise. To establish this requirement, there must be evidence of the relationships that connect the members of the enterprise, and it is not enough that several individuals "independently and without coordination, engaged in a pattern of crimes listed as RICO predicates." *See id.* at 958 n.4. But there is no requirement that the enterprise "have a hierarchical structure or a 'chain of command'" and "decisions may be made on an ad

hoc basis and by any number of methods." *Id.* at 948. Additionally, "[m]embers of the group need not have fixed roles; different members may perform different roles at different times," and "[t]he group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies." *Id.*

Here, the relationships between the members of the enterprise are well established through, *inter alia*, the series of written agreements tying the parties to each other through contractual and financial obligations. Among other things, the relationship between Think Finance, Plain Green, the Haynes Defendants, and GPLS is established through the "Term Sheet for Think Finance-Chippewa Cree Transaction," as well as the Participation Agreement, Administrative Agency Agreement, License and Support Agreement, Servicing Agreement, and Marketing Agreement. *See* Exs. 14, 15, 20-22. Similar agreements were also entered into with respect to Great Plains. *See* Exs. 16, 23-25. These agreements demonstrate an association-in-fact enterprise including Think Finance, Plain Green, Great Plains, Victory Park, GPLS, Haynes Investments, as well as their executives, officers, directors, and agents.

**Third**, the evidence easily establishes the required longevity of the enterprise. The enterprise "must have some longevity, since the offense proscribed by that provision demands proof that the enterprise had 'affairs' of sufficient duration to permit an associate to 'participate' in those affairs through" the predicate act. *Boyle*, 556 U.S. at 946. Further, "[w]hile the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence." *Id.* at 948. Here, the length of the operations of the enterprise, which commenced in 2011 and continued until the nationwide settlements in this case, more than satisfies the minimal requirement of some longevity.

**B.    Summary judgment should be awarded that the loans constituted unlawful debt as defined by RICO.**

RICO defines "unlawful debt" as a debt that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6). "As is evident" from the plain language, "the statute's definition of 'unlawful debt' invokes state as well as federal laws related to usury to provide the concept of 'unlawful[ness]." *United States v. Moseley*, 980 F.3d 9, 18 (2d Cir. 2020), *cert. denied*, 141 S. Ct.

1442, 209 L. Ed. 2d 159 (2021); *see also Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 148 (3d Cir. 2016) (noting that RICO "encompasses efforts to collect on a usurious loan").

In this case, there can be no dispute that the interest rate charged on the loans to Class Members contained twice the enforceable rate established by the state of California, which prohibits the taking or receipt of any money at a rate of more than 10% per year. Cal. Civ. Code § 1916-2 (West). By extension, this means that a loan to a California consumer constitutes "unlawful debt" under RICO if the interest rate exceeds 20%. 18 U.S.C. § 1961(6). There is ample, indisputable evidence that all loans to Class Members exceeded 20%. Most notably, Think Finance admitted pursuant to Rule 34 of the Federal Rules of Civil Procedure that all loans from Great Plains and Plain Green had annual percentage rates greater than 50%. Ex. 9 at Request Nos. 12, 16.

In addition, as part of the prior nationwide class settlement involving Think Finance, it agreed to "provide the proposed Class Administrator global historical loan level data" for the loans "sufficient to enable an analysis of state-by-state distribution percentages and for use in all other distribution calculations contemplated" by the settlement.[15] This "consumer-level account data from Think Finance" included "data fields" such as the "Interest Rate Used" on the loans. Ex. 13 at ¶¶ 3, 5. As summarized above in the Statement of Facts, this data shows that *all* loans originated in the name of Plain Green had interest rates that exceeded ███, including more than ███ loans that had interest rates ranging from ██████. Haac Decl. ¶ 6. Similarly, this data shows that all but two loans originated in the name of Great Plains had interest rates that exceeded ███, including more than ███ loans that had interest rates exceeding ███. Haac Decl. ¶ 5; Excel Exhibit 1.

Charging interest at rates exponentially higher than permitted by state law was the very reason for the venture between Think Finance and the tribal entities. Because the evidence shows that all but perhaps ███ loans had an interest rate in excess of 20%, summary judgment should be granted that the loans constituted "unlawful debt."

**C.    Summary judgment should be awarded that persons associated with the enterprise engaged in the unlawful collection of debt.**

---

[15] An excerpt of the "Global Settlement and Restructuring Term Sheet" dated June 6, 2019, is attached hereto as Ex. 12.

"Each prohibited activity is defined in 18 U.S.C. § 1962 to include, as one necessary element, proof either of 'a pattern of racketeering activity' or of 'collection of an unlawful debt.'" *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 232 (1989). "Unlike a 'pattern of racketeering activity' which requires proof of two or more predicate acts, to satisfy RICO's 'collection of unlawful debt' definition" the plaintiff "need only demonstrate ***a single collection***." *United States v. Giovanelli*, 945 F.2d 479, 490 (2d Cir. 1991) (emphasis added); *see also Hengle v. Asner*, 433 F. Supp. 3d 825, 891 (E.D. Va. 2020) ("An action based on the collection of unlawful debts 'requires only a single act of collection as a predicate for RICO liability.'") (quoting *Proctor v. Metro. Money Store Corp.*, 645 F. Supp. 2d 464, 481 (2009)); *United States v. Eufrasio*, 935 F.2d 553, 576 (3d Cir. 1991) ("Only one act of collecting or attempting to collect unlawful debt is necessary[.]").

Here, the undisputed evidence demonstrates that—**at a minimum**—Think Finance, Plain Green, Great Plains, Victory Park, and their employees were involved in an enterprise engaged in the unlawful collection of debt. Among other things, the evidence shows that Think Finance, Plain Green, and Great Plains entered into a series of agreements for the making and collection of unlawful debt. *See See* Exs. 14-16, 20-25. The evidence further establishes that actual collection of unlawful debt occurred, including with respect to the named Plaintiffs. *See* Ex. 13 at ¶¶ 12-14 (detailing the amounts each of the named Plaintiffs paid in excess of 20%). This data further shows that tens of thousands of "California Consumers" paid a total of "$75,009,501.42" on loans with Great Plains; and "$197,491,804.99" was collected on loans with Plain Green during the class period. *Id.* at ¶ 11. The trial should, therefore, focus on the amount to be awarded to Class Members, not whether the loans constituted "unlawful debt" in the first place.

In short, the evidence shows that multiple participants "were instrumental in setting up, and knowingly setting up, an enterprise whose sole purpose was to collect illegal debts." *Brice*, 372 F. Supp. 3d at 985. The evidence further shows far more than "a single act of collection" to establish the predicate offense of collection of unlawful debt. *Hengle*, 433 F. Supp. 3d at 891. Accordingly, summary judgment should be entered that substantive violations of § 1962(c) occurred, thereby making anyone found to be a conspirator "responsible for the acts" of Think Finance, Great Plains, and Plain Green (among others).

## CONCLUSION

For the above reasons, partial summary judgment should be entered in favor of Plaintiffs.

1 | Dated: May 19, 2021                    Respectfully submitted,

2
                                         By: _/s/ Anna C. Haac_
3                                        Anna C. Haac (pro hac vice)
                                         Mark A. Clifford (pro hac vice)
4                                        **TYCKO & ZAVAREEI LLP**
                                         1828 L Street, N.W., Suite 1000
5                                        Washington, DC 20036
                                         Phone: 202-973-0900
6                                        Fax: 202-973-0950
                                         Email: ahaac@tzlegal.com
7                                        Email: mclifford@tzlegal.com

8
                                         Kristi C. Kelly, Esq. (pro hac vice)
9                                        Andrew Guzzo, Esq. (pro hac vice)
                                         **KELLY GUZZO, PLC**
10                                       3925 Chain Bridge Road, Suite 202
                                         Fairfax, VA 22030
11                                       (703) 424-7572
                                         (703) 591-0167 Facsimile
12                                       Email: kkelly@kellyguzzo.com
                                         Email: aguzzo@kellyguzzo.com
13

14                                       Sabita Soneji (SBN 224262)
                                         **TYCKO & ZAVAREEI LLP**
15                                       1970 Broadway, Suite 1070
                                         Oakland, CA 94612
16                                       Telephone (510) 254-6808
                                         Facsimile (510) 210-0571
17                                       Email: ssoneji@tzlegal.com

18
                                         Craig C. Marchiando, Esq., (SBN 283829)
19                                       Leonard A. Bennett, Esq., (pro hac vice)
                                         Amy Leigh Austin (pro hac vice)
20                                       **CONSUMER LITIGATION ASSOCIATES, P.C.**
                                         763 J. Clyde Morris Blvd., Ste. 1-A
21                                       Newport News, VA 23601
                                         Telephone: (757) 930-3660
22                                       Facsimile: (757) 930-3662
                                         Email: lenbennett@clalegal.com
23                                       Email: craig@clalegal.com
                                         Email: amyaustin@clalegal.com
24
                                         *Attorneys for Plaintiffs*
25

26

27

28